FILED

03/16/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0328

DA 18-0328

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 65

STATE OF MONTANA,

      Plaintiff and Appellee,

    v.

JUAN ANASTASIO RODRIGUEZ,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADC 14-528(b)
Honorable Elizabeth A. Best, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

        Colin M. Stephens, Smith & Stephens, P.C., Missoula, Montana

      For Appellee:

        Austin Knudsen, Montana Attorney General, Jonathan M. Krauss, Assistant
Attorney General, Helena, Montana

        Joshua A. Racki, Cascade County Attorney, Jennifer Quick, Deputy County
Attorney, Great Falls, Montana

Submitted on Briefs:  December 9, 2020

Decided:  March 16, 2021

Filed:

                          Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1     Defendant and Appellant Juan Anastasio Rodriguez (Rodriguez) appeals from the April 5, 2018 Sentencing Order and Judgment issued by the Eighth Judicial District Court, Cascade County, following his conviction for Sexual Intercourse Without Consent (SIWOC), a felony, after a jury trial.

¶2     We restate the issues on appeal as follows:

1. *Whether the District Court erred by allowing the presentation of combined expert and lay testimony without providing a cautionary instruction or notice to counsel.*

2. *Whether the District Court violated Rodriguez's due process rights by failing to exclude the prosecutor from a hearing regarding defense counsel's representation.*

3. *Whether there is record-based evidence of ineffective assistance of counsel.*

¶3     We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     In 2003, Rodriguez, then a member of the United States Air Force, was stationed at Malmstrom Air Force Base in Great Falls.  One night in 2003, Rodriguez and his Air Force roommate Eric Stephens (Eric) met up with two teenage girls to hang out in town.  As the evening drew to a close, J.S., then 15 years old, needed a ride home as her friend and co-worker Jennifer Hahn (Jennifer) wanted to continue hanging out with Eric.  Rodriguez offered J.S. a ride home, which she accepted.  Rather than taking J.S. directly home, however, Rodriguez began to drive up the highway towards Havre to show off how fast his car could go.  Rodriguez then pulled off the highway in an isolated area outside of Great

2

Falls, pulled down J.S.'s pants, and forcibly anally raped her. Rodriguez then drove J.S. home and dropped her off. J.S., who was bleeding from the rape, went inside her house and cleaned herself off. She did not immediately tell her family or friends about the incident with Rodriguez and stopped hanging out with Jennifer. For years after the incident, J.S. did not tell anyone about the night Rodriguez raped her in 2003.

¶5 Rodriguez later left the Air Force after a general discharge and remained in Great Falls. He got married, had children, and started a successful roofing and siding business called J.R.'s Roofing and Siding. J.S. also remained in Great Falls, and she would occasionally see Rodriguez as he would attempt to contact her over the phone or by showing up at her apartment. Though she continued not telling her family or friends about the 2003 incident, J.S. did report that she had been raped on her medical intake forms with her medical provider, family nurse practitioner Ladonna Maxwell (Maxwell) in 2007, 2008, and 2010. One New Year's Eve, J.S. was out with her friend Alexis Warren (Alexis) when Rodriguez grabbed J.S. from behind while waiting in line at a bar in Great Falls. J.S. panicked and asked Alexis to leave immediately. After getting to their car, J.S. finally disclosed the 2003 incident to Alexis. J.S. subsequently verbally disclosed the rape to Maxwell during a 2011 appointment. Maxwell referred J.S. to counseling with a licensed clinical professional counselor, Barbara Bottomly (Bottomly), to whom J.S. further disclosed the 2003 rape during treatment and therapy.

¶6 In 2014, J.S. saw a post on Facebook about Rodriguez and his business. J.S. responded on Facebook, posting "He raped me when I was 15. I was to [sic] scared to say

3

anything then and Im.so.mad I didn't…that was almost 12 years ago now[. . . .] It makes me sick to think he's been allowed to run around enjoying life all these years." J.S.'s Facebook post was noticed by the Great Falls Police Department (GFPD). GFPD Detective Jesse Slaughter contacted and interviewed J.S. After this interview, Detective Slaughter investigated J.S.'s allegations and interviewed Jennifer, Alexis, Eric, and others. As a result of this investigation, the Cascade County Attorney's Office filed an Information in the District Court charging Rodriguez with a single count of felony SIWOC. Pursuant to an arrest warrant, Detective Slaughter then found and arrested Rodriguez. At the time of his arrest, Rodriguez claimed to Detective Slaughter that he did not know J.S. After being arrested, Rodriguez was housed at the Cascade County Detention Center (CCDC). At the CCDC, Rodriguez was housed near Robert Paliga (Paliga). According to testimony by Paliga at trial, during the time they were housed near each other Rodriguez admitted to committing the incident with J.S. but felt confident the State would not be able to convict him as there was no DNA or other physical evidence of the crime.

¶7     Though he was arrested in December of 2014, Rodriguez did not go to trial until December of 2017. Subject to a $200,000 bond in this case and revocation proceedings from previous charges, Rodriguez remained incarcerated until trial. Shortly after being arrested, Rodriguez retained Kenneth Olson as private counsel. On May 12, 2015, the parties filed a Plea Agreement regarding both this case and a previous revocation matter,

4

which, in relevant part, stated Rodriguez would plead guilty via an *Alford* plea[1] to an amended charge of felony sexual assault causing bodily injury. In return for Rodriguez's plea, the State agreed to recommend a 20-year sentence to the Montana State Prison (MSP), with 10 years suspended. The State further agreed to not seek to sentence Rodriguez as a Persistent Felony Offender. The matter was set for a change of plea hearing. At the July 23, 2015 change of plea hearing, Olson advised the District Court that Rodriguez wished to withdraw from the plea agreement and proceed to trial. Trial was then set for February of 2016. On January 8, 2016, however, Rodriguez filed an unopposed motion to continue the trial along with a Waiver of Speedy Trial. The District Court ultimately re-set the jury trial for January of 2017.

¶8    On June 22, 2016, Olson filed a Motion to Withdraw as Counsel, alleging he could no longer represent Rodriguez due to a serious conflict of interest and not being paid by Rodriguez for his services. The District Court granted Olson's motion to withdraw on June 27, 2016, and also set a hearing regarding Rodriguez's representation for July 14, 2016. That representation hearing was later re-set to August 11, 2016. At the hearing, Rodriguez informed the District Court he wished to have counsel from the Office of State Public Defender (OPD) appointed to represent him. Rodriguez further informed the court he wished for OPD attorney Vincent van der Hagen to be appointed to represent him. Following the hearing, the District Court ordered OPD to appoint counsel to represent

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160 (1970).

Rodriguez. Attorney van der Hagen filed his Notice of Appointment of Counsel on September 1, 2016, and officially began representing Rodriguez. On November 1, 2016, van der Hagen filed a Motion to Withdraw as Counsel Due to Conflict of Interest. The District Court granted van der Hagen's motion to withdraw on November 3, 2016, and ordered OPD to immediately appoint Rodriguez new counsel. On November 15, 2016, OPD filed a Notice of Appointment of Counsel, informing the court that Shari M. Lennon would now be representing Rodriguez. After a November 17, 2016 status hearing, the District Court issued an order which vacated the January 2017 trial date and set the matter for another status hearing on January 26, 2017. On December 29, 2016, attorney James F. Gardner filed a Notice of Counsel, informing the District Court he had been appointed as new counsel for Rodriguez by OPD. OPD filed a Notice of Substitution of Counsel on January 27, 2017, notifying the parties of the substitution of Gardner for Lennon. On February 23, 2017, the District Court re-set trial for May 22, 2017. Trial was then re-set for June 12, 2017. On May 24, 2017, Rodriguez filed both a Motion to Dismiss for violation of his right to a speedy trial and a Motion to Continue Jury Trial. The District Court re-set the jury trial for December 11, 2017. The court also denied Rodriguez's motion to dismiss on June 7, 2017.

¶9 On July 10, 2017, Rodriguez filed, pro se, a Motion to Substitute or Removal [sic] of counsel, alleging Gardner had provided ineffective assistance. On August 1, 2017, pursuant to a request by Gardner for an expedited hearing on Rodriguez's pro se motion, the District Court held a representation hearing. At that hearing, both Rodriguez and

6

Gardner spoke to the breakdown in their attorney-client relationship. Rodriguez was sworn in to testify to the allegations of ineffective assistance he made in his pro se motion, followed by the court asking Gardner to respond to those allegations. Gardner contradicted some of the claims made by Rodriguez. Counsel for the State was present throughout this hearing. On August 2, 2017, the District Court issued its Order Granting Substitute Counsel.[2] In this order, the District Court found that Gardner was not ineffective, but granted Rodriguez's motion to substitute counsel due to the complete breakdown in the attorney-client relationship. The court further ordered that the December 11, 2017 trial date would be maintained and would not be re-set.

¶10 On August 23, 2017, OPD filed notices of appointment for Rodriguez's new co-counsel, Scott B. Owens and Teal Mittelstadt. On November 2, 2017, Rodriguez filed a Motion for Order Endorsing Additional Witnesses, seeking to add Sharlene Rodriguez and John Marion (Marion) as additional witnesses. The District Court granted the motion on November 7, 2017. On December 5, 2017, the State filed a Motion to Exclude Witnesses or in the Alternative to Compel Disclosure of Material Information, which, in relevant part, sought to exclude Marion as a witness because Rodriguez had not provided Marion's contact information and the State was both unable to locate him and had not been provided with a statement as to what Marion would testify. At the December 5, 2017 Final

---

[2] Due to a typo, the District Court issued an Amended Order Granting Substitute Counsel on August 4, 2017. The substance of the court's order was unchanged.

Pretrial Conference, the District Court granted the State's motion to exclude Marion from testifying as he still could not be located.

¶11 The matter went to trial beginning on December 11, 2017. At trial, the jury heard testimony from J.S., Jennifer, Alexis, Maxwell, Jean McAllister, Paliga, Scott van Dyken, Ryan Heald, Eric, Bottomly, and Detective Slaughter. Relevant to the present appeal, Maxwell testified regarding seeing J.S. as her patient and her diagnosing J.S. with anxiety after the 2011 appointment at which J.S. disclosed the 2003 rape. McAllister testified as a "blind expert" regarding trauma, victim responses to traumatic events, and the nature of sexual assault—not specifically to the facts of the present case. After a three-day trial, the jury found Rodriguez guilty of SIWOC.

¶12 After trial, Rodriguez filed, under seal, a Motion for New Trial and a Brief in Support. The State filed a response brief, and the District Court denied the motion for a new trial in a written order on January 26, 2018. The matter then proceeded to a sentencing hearing on March 30, 2018. At the start of the hearing, the District Court held another representation hearing because it had come to light that Rodriguez had made complaints to OPD regarding his attorneys Owens and Mittelstadt. Counsel for Rodriguez asked for a closed hearing, which the court granted. The District Court allowed the State to remain at this closed hearing after counsel for the State argued he had a right to be present. The court heard testimony from Rodriguez, Owens, and Mittelstadt, as well as input from counsel for

8

the State.[3] Rodriguez informed the court of his issues regarding representation but did not request new counsel. The District Court found there was no reason to appoint new counsel and proceeded to the sentencing hearing. At the conclusion of the sentencing hearing, the District Court sentenced Rodriguez to 75 years at MSP, with 25 years suspended. The court further designated Rodriguez as a Tier II sexual offender.

¶13   Rodriguez appeals. Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶14   We review a district court's rulings on the admissibility of evidence, including oral testimony, for abuse of discretion. *State v. Champagne*, 2013 MT 190, ¶ 17, 371 Mont. 35, 305 P.3d 61 (citing *State v. Henderson*, 2005 MT 333, ¶ 8, 330 Mont. 34, 125 P.3d 1132). The district court has great latitude in ruling on the admissibility of expert testimony, and its ruling will not be disturbed without a showing of abuse of discretion. *State v. Kaarma*, 2017 MT 24, ¶ 82, 386 Mont. 243, 390 P.3d 609 (citing *State v. Stout*, 2010 MT 137, ¶ 59, 356 Mont. 468, 237 P.3d 37).

¶15   It is within the sound discretion of the district court to rule on requests for the appointment of new counsel, and we will not overturn a district court's decision absent an abuse of discretion. *State v. Gallagher*, 1998 MT 70, ¶ 10, 288 Mont. 180, 955 P.2d 1371 (citations omitted). A defendant "is entitled to substitute counsel if he presents material

---

[3] The District Court had previously issued an Order Protecting Counsel from the Commission on Practice and Other Disciplinary Actions so that Owens and Mittelstadt could respond to any complaints of ineffective assistance of counsel.

9

facts showing good cause for the substitution as demonstrated by: (1) an actual conflict of interest; (2) an irreconcilable conflict between counsel and the defendant; or (3) a complete breakdown in communication between counsel and the defendant." *State v. Johnson*, 2019 MT 34, ¶ 19, 394 Mont. 245, 435 P.3d 64. "A defendant is not entitled to substitute counsel based on a general claim of ineffective assistance of counsel[.]" *Johnson*, ¶ 19. A district court must "perform an 'adequate initial inquiry' to determine whether the defendant's complaints are 'seemingly substantial' when considering a defendant's request for substitute counsel." *Johnson*, ¶ 21. "A district court's inquiry is adequate if it considers a defendant's factual complaints together with counsel's specific explanations addressing the complaints." *Johnson*, ¶ 22 (citations omitted). A defendant "must present material facts showing that the attorney-client relationship has deteriorated to the point where the irreconcilable conflict or breakdown in communication prevents the mounting of an adequate defense." *Johnson*, ¶ 23.

¶16 Claims of ineffective assistance of counsel constitute mixed questions of law and fact which we review de novo. *State v. Clary*, 2012 MT 26, ¶ 12, 364 Mont. 53, 270 P.3d 88 (citing *State v. Heavygun*, 2011 MT 111, ¶ 8, 360 Mont. 413, 253 P.3d 897). "Only record-based ineffective assistance of counsel claims are considered on direct appeal." *State v. Howard*, 2011 MT 246, ¶ 18, 362 Mont. 196, 265 P.3d 606 (citing *State v. Trull*, 2006 MT 119, ¶ 25, 332 Mont. 233, 136 P.3d 551). This Court has adopted the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), in judging ineffective assistance of counsel claims. *State v. Crider*, 2014 MT 139, ¶ 34, 375

10

Mont. 187, 328 P.3d 612 (citing *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095). In order to show ineffective assistance of counsel, "a defendant must prove both (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense." *State v. Ward*, 2020 MT 36, ¶ 18, 399 Mont. 16, 457 P.3d 955 (quoting *Crider*, ¶ 34). In analyzing prejudice, the defendant must show a "reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance." *State v. Brown*, 2011 MT 94, ¶ 12, 360 Mont. 278, 253 P.3d 859 (citation omitted).

## DISCUSSION

¶17   *1. Whether the District Court erred by allowing the presentation of combined expert and lay testimony without providing a cautionary instruction or notice to counsel.*

¶18   "M. R. of Evid. 701 authorizes a lay witness to give an opinion, which is 'based on the [witness's] perception,' and is helpful for a clear understanding of the witness's testimony or a fact in issue." *Kaarma*, ¶ 84 (quoting *State v. Nobach*, 2002 MT 91, ¶ 14, 309 Mont. 342, 46 P.3d 618). Expert testimony is governed by M. R. Evid. 702. Expert witnesses may use their "scientific, technical, or other specialized knowledge" based on their "knowledge, skill, experience, training, or education" to assist the fact finder in understanding evidence or determining facts. M. R. Evid. 702. "Professional persons such as detectives, firefighters, paramedics, doctors, and dentists can testify under either M. R. Evid. 701 or 702; however, their testimony must comply with each rule accordingly." *Kaarma*, ¶ 84.

11

¶19 In this case, Rodriguez asserts the District Court wrongly allowed J.S.'s nurse practitioner, Maxwell, to present mixed lay and expert testimony without giving a cautionary instruction. The State points out that Rodriguez both did not object to Maxwell's testimony at trial—outside of a hearsay objection regarding Maxwell's treatment notes which was overruled—and now makes the assertion Maxwell was called and testified for an expert for the first time on appeal.

¶20 We generally do not address issues raised for the first time on appeal. *State v. Sedler*, 2020 MT 248, ¶ 10, 401 Mont. 437, 473 P.3d 406. "Plain error review is an exception to this general rule where we may consider issues raised for the first time on appeal." *State v. Akers*, 2017 MT 311, ¶ 10, 389 Mont. 531, 408 P.3d 142 (citations omitted). "To reverse a decision for plain error, the appellant must: (1) demonstrate that the claimed error implicates a fundamental right; and (2) firmly convince this Court that a failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Sedler*, ¶ 10 (citing *Akers*, ¶ 10).

¶21 We find plain error review is not warranted in this case. On appeal, Rodriguez does not appear to assert Maxwell's testimony itself was improper in any way, that he was somehow surprised by the testimony given by Maxwell at trial, or that Maxwell was not able to be qualified as an expert. Indeed, Rodriguez notes the State "[laid] foundation for Ms. Maxwell's qualifications as both a lay and expert witness" at trial. From our review of the record, when testifying as to her diagnosis of J.S. and her subsequent treatment

recommendations, Maxwell arguably may have provided mixed lay and expert testimony. We do not find, however, that the District Court failing to give a cautionary instruction to the jury regarding Maxwell's mixed-use testimony "would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Akers*, ¶ 10. Rodriguez cites to federal cases regarding such cautionary instructions, but we are not "firmly convinced" it is necessary to exercise plain error review to determine whether such an instruction should have been given by the District Court in this case as Rodriguez did not object to Maxwell's testimony at trial. *Sedler*, ¶ 10. As plain error review is not warranted here, the District Court is affirmed on this issue.

¶22    *2. Whether the District Court violated Rodriguez's due process rights by failing to exclude the prosecutor from a hearing regarding defense counsel's representation.*

¶23    Rodriguez asserts the District Court violated his right to due process by twice having *Gallagher* hearings regarding his complaints about appointed counsel with the State present. Once again, Rodriguez did not object to the State being present at these hearings and raises this issue for the first time on appeal.

¶24    On appeal, Rodriguez does not challenge the District Court's *Gallagher* rulings— that it was appropriate to substitute Gardner in 2017 and that it was not appropriate to substitute Owens and Mittlestadt just prior to the March 30, 2018 sentencing hearing— instead arguing his constitutional right to due process was violated by the State remaining present during these hearings. The State argues Rodriguez's claim is moot because

13

Rodriguez got what he wanted at both hearings—Gardner substituted at the first, and Owens and Mittlestadt retained but with a record of his grievances made at the second—and there is no longer a justiciable controversy. While we find Rodriguez's due process rights were not violated in this case, we disagree with the State that there is not a justiciable controversy here.

¶25 Rodriguez twice presented "seemingly substantial" complaints to the District Court about his appointed counsel. Because of these complaints, the District Court was required to conduct an "adequate inquiry" into Rodriguez's complaints. *Johnson*, ¶ 21. On August 1, 2017, the District Court held the first *Gallagher* hearing in this matter and conducted an inquiry into Rodriguez's complaints with his then-counsel, Gardner. Rodriguez testified to the allegations of ineffective assistance of counsel he made in his pro se motion. The District Court followed Rodriguez's testimony by asking Gardner to respond to those allegations. In response, Gardner contradicted some of the claims made by Rodriguez. Counsel for the State was present throughout this hearing. Following the hearing, the District Court granted Rodriguez's motion to substitute his counsel due to the breakdown in the attorney-client relationship.

¶26 The District Court held the second *Gallagher* hearing just prior to sentencing on March 30, 2018. At this hearing, Rodriguez testified to complaints he had with his trial counsel (and fifth and sixth attorneys on the case), Owens and Mittelstadt, but testified he did not seek to have the court substitute them. Once again, the State was present for this hearing as well. Rodriguez asked for a "closed hearing," which the District Court granted,

14

and the courtroom was cleared. Though Rodriguez did not object to the State staying during this hearing, the prosecutor asserted he had a right to be present as his input may be needed in accordance with *State v. Dethman*, 2010 MT 268, ¶ 18, 358 Mont. 384, 245 P.3d 30.

¶27 To begin, in *Dethman*, ¶18, we merely described a *Gallagher* hearing held by the district court in that case. We noted the district court in that case considered "Dethman's complaints; [counsel]'s explanation regarding the complaints; the Regional Public Defender Office's letters explaining its independent investigation and ultimate refusal to assign Dethman new counsel; the prosecutor's input; and the court's knowledge of [counsel]'s performance and communication with Dethman." *Dethman*, ¶ 18. This hearing description does not imply this Court requires or endorses a prosecutor remaining present at a *Gallagher* hearing regarding a defendant's legal representation. In order to safeguard issues protected by the attorney-client privilege, a court's initial inquiry in assessing the existence of (1) an actual conflict of interest; (2) an irreconcilable conflict between counsel and the defendant; or (3) a complete breakdown in communication between counsel and the defendant should be conducted with the defendant and his/her counsel outside the presence of the prosecution. If, after this initial inquiry, the court determines input from the prosecution is needed, such can then be obtained.

¶28 Here, although the District Court conducted its initial inquiries into Rodriguez's various complaints regarding his legal counsel in the presence of the prosecution, Rodriguez did not object or contemporaneously request the prosecution be precluded from

15

attending the closed proceedings. Thus, Rodriguez must establish reversal to be appropriate under plain error review. For reversal under plain error review, Rodriguez "must: (1) demonstrate that the claimed error implicates a fundamental right; and (2) firmly convince this Court that a failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Sedler*, ¶ 10 (citing *Akers*, ¶ 10). We cannot find the District Court's error in allowing the prosecutor to remain present at the *Gallagher* hearings resulted in a manifest miscarriage of justice, left unsettled the question of the fundamental fairness of the proceedings, or compromised the integrity of the judicial process. Rodriguez got exactly what he wanted at both hearings and there is no evidence the State used any of what was disclosed at those hearings against Rodriguez at trial. After the first *Gallagher* hearing, Gardner was substituted as counsel due to a complete breakdown in communication between counsel and defendant. *See Johnson*, ¶ 19. After the second *Gallagher* hearing, Owens and Mittelstadt were not substituted as Rodriguez testified he "wasn't asking for new attorneys." The District Court correctly denied substitution after the second *Gallagher* hearing because Rodriguez did not present "material facts showing good cause for the substitution as demonstrated by: (1) an actual conflict of interest; (2) an irreconcilable conflict between counsel and the defendant; or (3) a complete breakdown in communication between counsel and the defendant." *Johnson*, ¶ 19. At both *Gallagher* hearings, the District Court also conducted an "adequate inquiry" into Rodriguez's complaints by having him testify to those complaints and questioning his

16

attorneys regarding the same. *Johnson*, ¶ 21. The District Court therefore did not abuse its discretion when it substituted Gardner or when it declined to substitute Owens and Mittelstadt.

¶29 While the District Court should have precluded the State from remaining present during the *Gallagher* hearings, unless and until it decided input from the prosecution was necessary, the District Court conducted an "adequate inquiry" and its decisions regarding counsel were correct. *Johnson*, ¶ 21. Thus, plain error review is not warranted in this case and the District Court is properly affirmed on this issue.

¶30 *3. Whether there is record-based evidence of ineffective assistance of counsel.*

¶31 When defendants raise ineffective assistance of counsel claims on direct appeal, we must first determine whether the claims are more appropriately addressed in a postconviction relief proceeding. *State v. Santoro*, 2019 MT 192, ¶ 16, 397 Mont. 19, 446 P.3d 1141 (citing *Kougl*, ¶ 14). "[A] record which is silent about the reasons for the attorney's actions or omissions seldom provides sufficient evidence to rebut" the strong presumption counsel's conduct falls within the wide range of reasonable professional conduct. *State v. Sartain*, 2010 MT 213, ¶ 30, 357 Mont. 483, 241 P.3d 1032. If we cannot answer from the record "the question 'why' counsel did or did not take the actions constituting the alleged ineffective assistance, the claims are better raised by a petition for post-conviction relief where the record can be more fully developed, unless 'no plausible justification' exists for the defense counsel's actions or omissions." *Sartain*, ¶ 30 (quoting *Kougl*, ¶¶ 14-15 (internal citation omitted)).

17

¶32    Throughout the proceedings before the District Court, Rodriguez frequently clashed with his appointed counsel after his private counsel withdrew. On appeal, Rodriguez puts forth two reasons why his counsel was ineffective: (1) for not calling Marion to testify, and (2) for not eliciting statistics of false reports of sexual assaults from McAllister on cross-examination.

¶33    The State argues Rodriguez's first allegation of ineffective assistance of counsel—regarding the failure to call Marion to testify—is not record-based, and is therefore not appropriate for consideration on direct appeal. Rodriguez concedes the State's contention there is an insufficient record on this issue to review on direct appeal is "likely true," but asserts the failure was due to the State remaining present during the March 30, 2018 *Gallagher* hearing. We are not persuaded by Rodriguez's argument in this regard. There is nothing in the record demonstrating how or what was done by counsel to locate Marion. The only thing the record shows is that neither counsel for Rodriguez nor the State were actually able to ever locate Marion. There is also nothing in the record showing to what Marion was going to testify. A silent record, such as the one here, is not appropriate for reviewing a claim of ineffective assistance of counsel on direct appeal. *Sartain*, ¶ 30.

¶34    Rodriguez also asserts his counsel was ineffective for failing to have McAllister testify to false reporting statistics during cross-examination. During cross-examination, counsel for Rodriguez asked McAllister, referring to the State, "And they never asked you to come up here and talk about false reporting at all?" McAllister responded, "No, they did not." Shortly after beginning his redirect examination of McAllister, counsel for the

18

State requested a sidebar to address whether Rodriguez had opened the door to additional testimony about false reporting of sexual assaults. Counsel for Rodriguez informed the District Court he had "no intent in my closing to talk about false reporting." The District Court determined it would permit the State "to go into it but if you aren't pursuing it further, I think we will end it there." In accordance with this discussion, the State ended its redirect examination of McAllister with the following exchange:

> Q. Ms. McAllister, the last question defense counsel asked you was about false reporting. Is that right?
>
> A. That's correct.
>
> Q. And there are scientific studies in that area, correct?
>
> A. That's correct.
>
> Q. But there is a legal ruling in the State of Montana and we can't have you testify to that?
>
> A. That's my understanding, yes.

Counsel for Rodriguez did not call any witnesses and did not talk about false reporting during closing argument.

¶35    Here again, we lack a sufficient record to determine "why" counsel for Rodriguez did not attempt to elicit false reporting statistics from McAllister on cross-examination and this claim is therefore not appropriate for consideration on direct appeal. *Sartain*, ¶ 30. Though Rodriguez argues his counsel did not get into those statistics due to a misunderstanding of the law, we cannot determine whether counsel's actions were due to a "misunderstanding" or were simply a tactical decision. Certainly, it may be a reasonable

19

tactical decision for defense counsel to avoid eliciting statistics about the false reporting of sexual assaults based on those statistics themselves, as the expert could say that false reporting was exceedingly rare and damage the defense. *See generally State v. Grimshaw*, 2020 MT 201, ¶¶ 24-25, 401 Mont. 27, 469 P.3d 702. There is therefore insufficient evidence presented to rebut the presumption that counsel's decision fell within the "wide range of reasonable professional conduct." *Santoro*, ¶ 16.

¶36 Rodriguez asserts the failure to elicit the false reporting statistics was simply due to his counsel erroneously believing getting into those statistics was prohibited. Setting aside the insufficient record to determine whether this was a tactical decision on the part of counsel or not, counsel's belief in this regard was not incorrect. We have long limited the introduction of false reporting statistics as an "improper comment on the credibility of" the alleged victim in sex crime cases. *State v. Brodniak*, 221 Mont. 212, 222, 718 P.2d 322, 329 (1986). After trial in this case, we have since reaffirmed that holding in *Grimshaw*, *Grimshaw*, ¶ 28, and noted that we distinguish allowable "educational testimony regarding general causes of false reports in child sexual abuse cases" from "statistical testimony regarding false reporting" which is disallowed. *State v. Reams*, 2020 MT 326, ¶ 16 n.1, 402 Mont. 366, 477 P.3d 1118. Counsel for Rodriguez likely being aware of both the possibility McAllister would testify false reports of sexual assault are rare and of this Court's determination that the introduction of false reporting statistics is an "improper comment on the credibility of" a witness may possibly explain counsel's actions. Thus,

20

Rodriguez has failed to establish his ineffective assistance of counsel claims on direct appeal.

## CONCLUSION

¶37    Plain error review is not warranted for either Issue 1 or Issue 2 in this case.   In addition, Rodriguez's claims of ineffective assistance of counsel are not record-based and are not appropriate for direct appeal.

¶38    Affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JIM RICE