FILED

11/09/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0666

DA 19-0666

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 288

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

LOUIS W. MIKESELL,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDC 2017-213
Honorable James P. Reynolds, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Carolyn Gibadlo, Assistant Appellant Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Roy Brown, Assistant Attorney General, Helena, Montana

            Leo Gallagher, Lewis and Clark County Attorney, Stephanie Robles, Ann Penner, Deputy County Attorneys, Helena, Montana

                   Submitted on Briefs:  October 6, 2021

                            Decided:  November 9, 2021

Filed:

_____
                Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    A jury convicted Louis Mikesell in the First Judicial District Court, Lewis and Clark County, of felony sexual intercourse without consent (SIWC) in violation of § 45-5-503(1), MCA.  Mikesell appeals his conviction and presents the following issue for review:

> *Did trial counsel render ineffective assistance when counsel allowed prior consistent statements from a forensic interview into evidence without challenge?*

¶2    We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    In 2017, the State charged Mikesell with one count of felony SIWC for conduct that occurred between 2012 and 2017.[1]  The victim, D.T., was between five and ten years old at the time of the offenses and twelve at the time of trial.  Mikesell and his wife, Patricia, are D.T.'s grandparents.  D.T., her mother Jamie, and her two older brothers moved in with Mikesell and Patricia after Jamie separated from her husband.  The family lived in several residences with Mikesell and Patricia.

¶4    Around Easter 2017, D.T. and Jamie went to Jamie's friend's house.  D.T. disclosed to Jamie's friend that Mikesell touched her inappropriately.  The friend relayed this disclosure to Jamie, who packed the family up and left Mikesell's residence.  The following day, police interviewed Jamie while D.T. had a forensic interview with Paula Samms (Samms) of the Child Advocacy Center in Helena.  D.T.'s medical exam by Dr. Erin Keefe

---

[1] The State charged Mikesell with two additional counts of felony assault on a minor for actions toward D.T.'s brothers.  These counts were later severed.

2

came back with normal results, which Dr. Keefe testified did not rule out abuse. Mikesell admitted to napping with D.T. in his police interview. When asked whether anything sexual happened while napping, he replied, "I don't know. I was in heaven." Mikesell admitted to kissing D.T. on the cheek and "pat[ting her] on the butt." However, he generally denied the allegations and blamed them on his poor relationship with Jamie. He believed Jamie's friend was "put[ting] words into [D.T.'s] mouth."

¶5     At a pretrial conference, the parties discussed an agreement to play D.T.'s entire forensic interview for the jury if D.T. testified inconsistently at trial:

> [District Court]: Okay. Any other pretrial matters that we need to address?
>
> [State]: I don't think so. I guess the one thing I would ask of the Court is, I think that [defense counsel] and I are in agreement about this, but should the victim or any one of the other child witnesses be unable to testify consistently at trial with what they've said in their forensic interviews, the State would be seeking to admit and publish for the jury videotapes, copies of those forensic interviews, of course with the proper foundation.
>
> I think that [defense counsel] and I agree that should the child witnesses testify inconsistently, that those are admissible and would come in under current case law, but I have also presented cases for the Court's reference. I guess maybe just to address it if that's an issue or for an agreement on the case law on that issue.
>
> [Defense counsel]: I think once I challenge her through cross, then the prior consistent statements come in.
>
> [District Court]: Okay.
>
> [Defense counsel]: That's my reading of the case law.
>
> [State]: I would agree.

The State informed the District Court that Mikesell objected to edits of the forensic interview. Mikesell did not dispute the State's assertion and clarified that the only

3

objection concerned D.T.'s forensic interview statements regarding the two severed charges of alleged physical abuse of her brothers by Mikesell. The District Court ruled that the forensic interview video would be admitted. Mikesell's first trial resulted in a mistrial due to juror misconduct.

¶6    Mikesell's second jury trial occurred a year later. The record contains no indication that the parties discussed D.T.'s forensic interview video again. D.T. testified that she napped with Mikesell while her brothers and Patricia were home. She recounted that, around Easter 2017, she and Mikesell were napping in his bedroom with the door closed when he made her touch him and told her "he wanted his tongue to go in between [her] legs and then he. . . grabbed [her] legs and pulled [her] like to the edge of the bed and then. . . licked [her] vagina." She testified that Mikesell also unzipped his pants and made her touch his penis with her hand. She stated that nothing else happened on Easter and "[i]t was the first time he licked" her. She recalled that he made her touch his penis before and touched her on the vagina but could not remember specific details.

¶7    D.T. recounted another instance where Mikesell licked and sucked on her neck and gave her a hickey. When Jamie asked where the hickey came from, D.T. would not say because she was afraid Mikesell would hurt her. She further testified that the abuse occurred in other locations besides Mikesell's bedroom, including an RV he previously owned and during car rides. She also recounted an incident during a family reunion where Mikesell touched her vagina and made her touch him in the tent where her brother was sleeping.

4

¶8     D.T.'s testimony contained several statements inconsistent with her forensic interview.  First, on direct, D.T. testified that Mikesell put his penis inside her on one occasion.  However, on cross-examination, D.T. stated that Mikesell's penis never went inside her.  She clarified on redirect that Mikesell rubbed his penis against her vagina, but his penis did not enter her vagina.  However, during her forensic interview, D.T. repeatedly stated that Mikesell put his penis in her vagina.  Second, D.T.'s testimony on cross-examination indicated that Mikesell did not abuse her anywhere else in the house besides his bedroom, and she affirmed that she did not recall any other incidents than the ones described in her testimony.  However, her forensic interview contained statements that Mikesell had abused her on the couch in the living room, in her bedroom in Lincoln, in Mikesell's bedroom, in the family's RV, and in the bathroom.  Third, only in D.T.'s forensic interview did she say that Mikesell forced her to engage in anal sex.

¶9     Moreover, concerning the Easter incident specifically, D.T.'s accounts of details differed.  In her forensic interview, D.T. indicated Mikesell, after her brother accidentally poked her in the eye, invited her into the bedroom and asked if she wanted to take a nap.  On direct examination at trial, D.T. testified she was already taking a nap when Mikesell assaulted her and her testimony did not mention fighting with her brother.  On cross-examination, she denied that anyone told her to take a nap and testified she was already in his bedroom watching television with him at the time.  There were also inconsistencies surrounding how D.T.'s clothes were removed.  On direct examination, D.T. testified that she was "pretty sure" she took her clothes off, but "[couldn't] really remember."  On cross-examination, she testified that she was not fully naked and that

5

Mikesell took her pants off. During her forensic interview, D.T. stated that Mikesell pulled her pants off and forced her to take off her shirt. D.T.'s account of what she was wearing on Easter also differed. On direct, she testified that Mikesell pulled down her pants. On cross-examination, she testified that she was wearing "a dress, a butterfly dress" on Easter. A few minutes later, defense counsel had the following colloquy with D.T.:

[Defense counsel]: How did your pants get off?

[D.T.]: He took them off.

[Defense counsel]: But you told us you were wearing a butterfly dress?

[D.T.]: I did, didn't I?

[Defense counsel]: Yeah.

[D.T.]: I can't really remember.

On redirect, she explained that she may have changed out of the dress but was unsure. In the forensic interview, she stated that she was wearing a "cowgirl shirt" and pants on Easter.

¶10 After D.T.'s direct testimony, defense counsel explained her plan to cross-examine D.T. about her statements made in the video:

[Defense counsel]: Are you intending on showing her video?

[State]: Yes.

[Defense counsel]: There are some questions I would like to ask her about that video and some of the things that she said. I just want to make sure that everybody knows that that's where I'm going here.

[State]: Okay.

[District Court]: Are you going to show that video before cross-examination?

[State]: No. I'll lay the foundation with Paula Samms and call her after we lay.

[Defense counsel]: If that's acceptable, which I would assume it would be?

[District Court]: All right.

[Defense counsel]: Thank you.

¶11 D.T. was asked on cross-examination about her statement in the forensic interview regarding how her body felt during the abuse:

[Defense counsel]: I believe the question that was asked to you is how did it feel and the response was, you know, the body reacts. It likes it but you don't like it in real life. It feels good but it doesn't.

. . .

[Defense counsel]: Do you recall making that statement?

[D.T.]: I can't remember.

[Defense counsel]: You don't remember, okay. Really, [D.T.], what I'm wondering at is do you recall anyone ever telling you that or you hearing that phrase somewhere else?

[D.T.]: No.

Defense counsel also asked D.T. if she recalled her statement in her forensic interview about the duration of abuse by Mikesell:

[Defense counsel]: What did you say to [Samms], if you remember?

[D.T.]: I'm pretty sure I said about like five years.

[Defense counsel]: Okay. Do you remember telling her anything else?

[D.T.]: No, not that I recall.

7

[Defense counsel]: All right. Did you have discussions -- after you made the disclosure, did you have discussions with your mom about the abuse?

[D.T.]: No.

[Defense counsel]: Okay. Did your mom ever tell you how long she thought it had been going on?

[D.T.]: Not until after Paula.

[Defense counsel]: After you had your discussion with Paula?

[D.T.]: Yeah.

[Defense counsel]: So you didn't have that discussion with your mom before your Paula interview?

[D.T.]: Yeah.

[Defense counsel]: You're sure?

[D.T.]: Yes.

In her forensic interview, D.T. explained to Samms:

[D.T.]: And mommy thinks she said it's been going on to I was five . . .

[Samms]: Uh-huh.

[D.T.]: When I was five and older, so. . .

[Samms]: Well, what do you think? How old do you remember being the first time that happened?

[D.T.]: I can't remember. But it felt like he'd done it my whole life.

Aside from the above noted inconsistencies, D.T.'s testimony concerning the Easter incident, the hickey, and an incident in Mikesell's RV was generally consistent with her forensic interview statements.

8

¶12 Samms testified immediately after D.T. She provided information on the forensic interview process, her method of asking open-ended questions, and how she observes body language. Samms also testified about D.T.'s demeanor, body language, and how D.T. relayed information during the interview. Samms provided foundation for the forensic interview video, which the State introduced and played for the jury. Defense counsel did not object. The State also presented testimony from the following witnesses: Dr. Wendy Dutton, Dr. Keefe, D.T.'s brother Trevor, Jamie, Patricia, and Detective Joshua Van Dyke. Mikesell presented testimony from his doctor, Dr. Todd Wampler, and Matthew Mikesell.

¶13 During closing argument, both the State and Mikesell focused on D.T.'s testimony and credibility. The State pointed out the consistency between D.T.'s forensic interview and her testimony at trial, arguing, "That's exactly what [D.T.] said in the forensic interview. That's exactly how she described it in the forensic interview when she testified about it way back in April of 2017."

¶14 Conversely, Mikesell's closing argument focused on inconsistencies between her forensic interview statements and her trial testimony. Defense counsel discussed D.T.'s statement made during her forensic interview that Jamie told her the abuse began when she was five years old, arguing that Jamie's discussion with D.T. "should raise some concerns. The whole reason we do the forensic interview is to prevent that exact thing. So when it's already occurred . . . I would suggest to you that the process has been tainted from that point forward." Defense counsel also pointed out the inconsistencies between D.T.'s testimony and her interview statements regarding her clothing and the details around the incidents:

9

In this case we do have [D.T.] changing some of the details. Suggestive, I'm not saying that's sort of a deal killer, but it is suggestive. I would suggest to you that the big issues, the things like anal penetration, [D.T.] would remember, and I don't believe that she relayed that. Rely on your own notes, but I don't think she relayed that in her testimony today like she did in her interview. And in her interview it was, oh, yeah. She says, oh, yeah. I forgot about the anal penetration.

Defense counsel further argued that Samms's techniques tainted D.T.'s interview and concluded by arguing "the State hasn't proved its case beyond a reasonable doubt. Particularly the fact that [D.T.'s] testimony is at least somewhat inconsistent with her original forensic interview."

¶15    After a four-day trial, the jury convicted Mikesell.  The District Court sentenced Mikesell to 100 years in prison, with 75 years suspended, along with a 25-year parole restriction.  Mikesell appeals.

## STANDARD OF REVIEW

¶16    Claims of ineffective assistance of counsel constitute mixed questions of law and fact which we review de novo.  *State v. Rodriguez*, 2021 MT 65, ¶ 16, 403 Mont. 360, 483 P.3d 1080 (citations omitted).

## DISCUSSION

¶17    *Did trial counsel render ineffective assistance when counsel allowed prior consistent statements from a forensic interview into evidence without challenge?*

¶18    Mikesell argues that counsel provided ineffective assistance of counsel and misunderstood the application of the hearsay rule when she allowed the State to present D.T.'s entire forensic interview video without objection.  The State contends that

10

Mikesell's claim of ineffective assistance of counsel is inappropriate for direct appeal and cannot be resolved on the record before us.

¶19 We have adopted the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), to judge ineffective assistance of counsel claims. *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861. To show ineffective assistance of counsel, "a defendant must prove both (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense." *State v. Ward*, 2020 MT 36, ¶ 18, 399 Mont. 16, 457 P.3d 955 (citations and internal quotations omitted). In analyzing prejudice, the defendant must show "a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance." *State v. Brown*, 2011 MT 94, ¶ 12, 360 Mont. 278, 253 P.3d 859. A strong presumption exists that counsel's performance was "within a broad range of reasonable professional assistance." *Brown*, ¶ 12.

¶20 However, before addressing the two prongs of *Strickland*, we first assess whether the claims are more appropriately addressed in a postconviction relief proceeding. *State v. Kougl*, 2004 MT 243, ¶ 14, 323 Mont. 6, 97 P.3d 1095. Absent a complete record, we will not speculate on counsel's alleged errors. *State v. Dyfort*, 2000 MT 338, ¶ 11, 303 Mont. 153, 15 P.3d 464. The "definitive question" that clarifies which actions are record and which are non-record is "*why* counsel took the particular course of action?" *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340 (emphasis in original). If the record explains "why," we will address the issue on appeal. *Kougl*, ¶ 14. If the claim arises from matters outside the record on appeal, we will not address the issue on appeal

and allow the defendant to file a postconviction proceeding that develops a record as to why counsel acted as alleged, thus allowing the court to determine whether counsel's performance was ineffective or merely a tactical decision. *Kougl*, ¶ 14.

¶21 Generally, "an alleged failure to object to the introduction of evidence . . . [or] the testimony of a witness . . . has been deemed record-based[.]" *White*, ¶ 15. However, decisions regarding the timing and number of objections lie within counsel's tactical discretion and indicate that non-record based information may be involved. *State v. Brown*, 228 Mont. 209, 212, 741 P.2d 428, 430 (1987) (citations omitted). We have also recognized that a non-record based act or omission by counsel may include a failure to object to the admission of evidence which is evidenced by the record. *White*, ¶ 16. As such, "if the record does not fully explain why counsel failed to object to the admission of evidence, the matter is best-suited for post-conviction proceedings . . . ." *State v. Notti*, 2003 MT 296, ¶ 8, 318 Mont. 146, 79 P.3d 289 (citing *White*, ¶¶ 15, 20). Accordingly, claims involving alleged omissions of trial counsel are often ill-suited for consideration on direct appeal. *State v. Hinshaw*, 2018 MT 49, ¶ 21, 390 Mont. 372, 414 P.3d 271.

¶22 Of course, we may consider a claim not based on the trial record if no plausible justification exists for counsel's action or inaction. *State v. Wittal*, 2019 MT 210, ¶ 13, 397 Mont. 155, 447 P.3d 1039 (citing *Kougl*, ¶ 15). We have recognized the existence of "a multitude of outside factors that may influence" an attorney's decision making. *Kougl*, ¶ 19 (citing *State v. Herrman*, 2003 MT 149, ¶ 29, 316 Mont. 198, 70 P.3d 738 (discussing factors influencing when an attorney challenges or does not challenge the selection of a juror)). We have also previously recognized that an insufficient record may

12

preclude us from determining whether counsel's actions were due to a misunderstanding of the law or were simply a tactical decision. *See Rodriguez*, ¶ 35.

¶23 The record before us implies at least a plausible justification for counsel's actions. The evidence underscores inconsistencies in D.T.'s story and could reasonably undermine her credibility. The record further indicates that defense counsel may have viewed D.T.'s forensic interview as a strategic key to Mikesell's defense. Defense counsel elicited responses highlighting these inconsistencies during D.T.'s cross-examination and reiterated the inconsistencies at closing argument. The record fails to fully explain defense counsel's understanding of hearsay and failure to object to the forensic interview video and does not shed light on counsel's decisions. The record also contains no indication which statements in D.T.'s interview would be objectionable because defense counsel declined to object. Nor does the record provide the basis for counsel's conclusion that D.T.'s consistent statements were admissible upon cross-examination. Because of the general indications that defense counsel may have had specific tactical intentions regarding D.T.'s forensic interview video, we cannot determine, without more evidence, whether defense counsel did not perform effectively for Mikesell. We decline to speculate as to the reasoning for counsel's actions.

## CONCLUSION

¶24 We conclude Mikesell's ineffective assistance of counsel claims cannot be reviewed on direct appeal and are dismissed without prejudice. Mikesell's conviction is affirmed.

/S/ LAURIE McKINNON

13

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR