FILED

03/14/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0094

DA 22-0094

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 43

AARON JOEL OLIPHANT,

       Petitioner and Appellant,

  v.

STATE OF MONTANA,

       Respondent and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause Nos. ADV-2016-270,
ADV-2020-874
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

             Paul M. Leisher, F. Peter Landsiedel, Leisher & Landsiedel P.C.,
Missoula, Montana

             Caitlin Carpenter, Montana Innocence Project, Missoula, Montana

       For Appellee:

             Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant
Attorney General, Helena, Montana

             Kevin Downs, Lewis and Clark County Attorney, Helena, Montana

                         Submitted on Briefs:  January 11, 2023
                               Decided:  March 14, 2023

Filed:

                  _____
                               Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    Aaron Oliphant (Oliphant) appeals from an Order denying his Petition for New Trial in Cause No. ADC-2016-270 and an Order on Petition for Postconviction Relief in Cause No. ADV 2020-874 issued by the First Judicial District Court on January 20, 2022.  We affirm.

¶2    We restate the issues on appeal as follows:

*Issue One: Did the District Court correctly deny Oliphant's petition for postconviction relief based on an absence of newly discovered evidence as required by § 46-21-102(2), MCA?*

*Issue Two: Did the District Court correctly deny Oliphant's petition for a new trial based upon the alleged ineffective assistance of his trial counsel?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3    On June 29, 2016, the State filed an Information charging Oliphant with felony aggravated assault of his son, R.O., in violation of § 45-5-202, MCA.  Oliphant was represented by counsel during the jury trial that occurred on September 25-27, 2017.  He was convicted of felony aggravated assault.  The District Court sentenced Oliphant to twenty years in Montana State Prison with five years suspended.

¶4    He did not timely appeal or otherwise challenge his conviction.  Oliphant now asserts that his family reached out to his attorney, J. Mayo Ashley (Ashley), about appealing his conviction but Ashley responded by denying the existence of any appealable issues and omitting any information about postconviction relief.  Ashley died on March 29, 2018.  Later, the Montana Innocence Project (MTIP) agreed to represent Oliphant.  On

June 3, 2020, 856 days after the court issued its judgment, Oliphant filed a petition for a new trial and a petition for postconviction relief (PCR petition).

¶5    MTIP attempted to gather relevant information about Oliphant's case from Julie Johnson (Johnson), Ashley's legal secretary at the time of the trial, as well as from medical providers. Johnson provided MTIP with an allegedly incomplete case file. According to a declaration by Johnson submitted as part of Oliphant's PCR petition, Ashley, prior to trial, expressed his intent to hire a medical expert but ultimately did not—a decision he allegedly regretted following Oliphant's conviction. Johnson's declaration also details that Ashley was undergoing cancer treatment during his representation of Oliphant. Johnson maintains that this treatment, combined with other health issues, resulted in Ashley having significant difficultly hearing, speaking, and eating prior to and throughout the trial. In Johnson's opinion, Ashley's "health had declined to a point that he was unable to effectively represent Mr. Oliphant." In contrast, Oliphant claims to have been unaware of these health ailments.

¶6    Oliphant claims to have been misled by Ashley's assertion that the State had no evidence. He contends Ashley provided ineffective assistance by making "minimal opening and closing statements," opting not to cross-examine two of the State's medical experts, conceding that someone assaulted R.O., and choosing not to raise a single objection during trial.

¶7 MTIP—in its role as Oliphant's counsel—asserts that nearly all medical providers, at the direction of the State, denied MTIP's requests for medical records.[1] By way of example, MTIP reports that an attorney from St. Peter's Hospital—after they conferred with the Lewis and Clark County Attorney's Office—replied to MTIP's request by encouraging MTIP to get a court order. The attorney who prosecuted Oliphant similarly responded to MTIP's request for medical records by asking that they get a court order. However, MTIP claims to have received forty-five pages of medical records from Ciox Health—records that were not in Ashley's case file delivered by Johnson to MTIP.

¶8 On January 21, 2022, the District Court denied without a hearing Oliphant's motion for new trial and PCR petition. The court concluded that the PCR petition was time-barred because Oliphant did not appeal his conviction within sixty days of his judgment becoming final. The court did not waive this time bar on equitable grounds because Oliphant failed to provide newly discovered evidence.

¶9 Oliphant contends that a report offered by John G. Galaznik, M.D. (Dr. Galaznik)—based on the allegedly incomplete set of medical records MTIP received—proved his innocence. Dr. Galaznik concludes that R.O.'s symptoms indicated sinus or cortical vein thrombosis (SVCT)—a diagnosis that R.O.'s medical providers failed to explicitly rule out.

---

[1] Oliphant's Reply Brief includes a table listing several documents and assessing whether or not Primary Children's Hospital provided a copy, whether or not Ashley's case file included the document, and whether or not Dr. Galaznik interpreted the document as part of his report. It is unclear whether any of the documents missing from Ashley's case file or not reviewed by Dr. Galaznik contained information distinct from that included in available documents. For instance, nine of the twenty-one documents refer to Safe and Health Family Team and Social Work notes that contain medical information reproduced in other, available documents or shared through witness testimony.

Dr. Galaznik also questions the timing and, consequently, the diagnostic implications of the MRI of R.O.'s brain.

¶10 The State presented testimony from five experts. Each of those witnesses— Michelle Danielson, M.D. (Dr. Danielson), Venus Villalva, M.D. (Dr. Villalva), John Rampton, M.D. (Dr. Rampton), David Dries, M.D. (Dr. Dries), and Karen Hansen, M.D. (Dr. Hansen)—offered testimony that supported a diagnosis of abusive head trauma and undermined the initial diagnosis of R.O.'s symptoms made by the Emergency Room staff at St. Peter's.[2]

¶11 Dr. Galaznik's report offered a different interpretation than those the State's witnesses presented at trial.

¶12 Dr. Danielson, a pediatrician at Partners in Pediatrics in Helena, testified in person at trial. She noted that on June 9, 2016, Brittany, the child's mother, called into the clinic to share concerns about R.O.'s demeanor and symptoms. Brittany reported that R.O. was very irritable, inconsolable, and, at times, difficult to arouse. Brittany also shared that R.O. had vomited a large amount. Dr. Danielson noted that Brittany told her that R.O. appeared playful and smiling in a photo that Oliphant texted to Brittany around 8:30 p.m. on June 8, 2016—R.O. was under Oliphant's care while Brittany was at work. Brittany then disclosed that Oliphant reported to her that by 9:00 p.m. that night R.O. had become fussy and cried as if he were in a lot of pain—symptoms that persisted throughout the night and into the

---

[2] The ER nurse regarded R.O.'s symptoms as "classic" indicators of shaken baby syndrome and dismissed the presence of any retinal hemorrhaging based on their naked eye review of R.O.'s scans.

5

next day.  Upon hearing of these and other symptoms, Dr. Danielson encouraged the nurse to recommend that Brittany bring R.O. into the ER.

¶13    Dr. Danielson was particularly concerned about R.O.'s unresponsiveness, lethargy, and listlessness because these suggested that a "neurological process" was going on.  Upon R.O. being admitted to the hospital, Dr. Danielson requested a CT scan of R.O.'s head. The scan produced a reading that was, according to a radiologist at St. Peter's, "pretty non-impressive," and "not very concerning" given that it did not clearly indicate a fracture. However, Dr. Danielson remained concerned about R.O.'s condition based on "his symptoms after [she] examined him and . . . what [she] saw on the head CT[.]"  She characterized R.O.'s symptoms as indicative of "an abnormal neurological exam." Dr. Danielson sought a second opinion of R.O.'s CT scan.  She provided the scan to a pediatric radiologist in Seattle who, after reviewing the scans, reported evidence consistent with a non-accidental trauma resulting in bleeding and skull fractures.  Dr. Danielson agreed with the diagnosis—non-accidental trauma.  She considered alternative causes of the symptoms but determined that "no other abnormal lab test . . . would lead to a different diagnosis."  However, she did agree that R.O. required an MRI, which is why R.O. was flown to Primary Children's Hospital in Salt Lake City, Utah—a facility that, unlike St. Peter's, had a pediatric anesthesiologist on staff.  Dr. Danielson recalled the MRI occurring on June 13 or 14, 2016.

¶14    Dr. Danielson shared her diagnosis of non-accidental trauma with Child Protective Services as well as Brittany and Oliphant.  Brittany responded in an emotional manner and, per Dr. Danielson, expressed an appropriate amount of concern.  Oliphant was "pretty

6

quiet" and did not demonstrate a "lot of reaction." When Oliphant attempted to console Brittany, Dr. Danielson observed Brittany withdrawing from his contact.

¶15 Dr. Villalva, a pediatrician at Partners in Pediatrics and R.O.'s primary care physician, testified in person at trial. She started caring for R.O. on February 16, 2016, shortly after his birth. Her first examination of R.O. indicated that he was "[d]oing really well." On March 31, 2016, she conducted her second examination of R.O. and concluded that R.O. "was thriving and doing really well." Based on parental concerns that R.O. had been experiencing nasal congestion and spitting up a portion of his feeding, Dr. Villalva diagnosed R.O. with gastroesophageal reflux—an "excessively common" diagnosis for babies. On May 25, 2016, Dr. Villalva examined R.O. for the third time and noted that he was "doing well." She did not document any conversation of reflux issues during that examination. On June 6, 2016, Brittany brought R.O. in for a sick visit with Dr. Villalva based on "[c]old symptoms, a lingering cough, and [R.O.] . . . throwing up that day." Dr. Villalva remarked that R.O. "looked great," but diagnosed him with a viral illness based on his symptoms and Brittany sharing that R.O.'s siblings had colds.

¶16 Dr. Villalva indicated that R.O. was brought to the ER two days later, on June 8, 2016. However, she did not see him that day. On June 10, 2016, Dr. Villalva took over care of R.O. Upon review of his CT scan, Dr. Villalva was concerned about intracranial bleeding. Dr. Danielson informed Dr. Villalva of the related concerns expressed by the Seattle-based pediatric radiologist. Based on these concerns, Dr. Villalva ordered an MRI of R.O.'s brain. When R.O. returned from Salt Lake City, where he underwent an MRI, he remained under the care of Dr. Villalva. She reported that R.O. experienced seizures

7

while in Salt Lake City that were serious enough to necessitate R.O. spending time in the Intensive Care Unit there.

¶17 Dr. Villalva continued a prescription of Keppra to treat R.O.'s seizures. She indicated her ongoing plan was to monitor R.O. given his "increased risk for developmental disabilities" as a result of "his injuries and seizures as a consequence" of those injuries. As of the time of her testimony, Dr. Villalva shared that R.O. was receiving physical therapy specifically addressing some gross motor delays and weaknesses in addition to occupational therapy to address "some speech delays and . . . fine motor delays." Dr. Villalva predicted that, due to the injuries and resulting developmental issues, R.O. will have academic and learning struggles. She confirmed that prior to the June 8, 2016 injury she had no concerns about his development.

¶18 Dr. Rampton was deposed by the State in Salt Lake City on September 21, 2017, and Ashley physically attended and participated in the deposition. As of 2017, Dr. Rampton had been practicing at Primary Children's in Salt Lake City for ten years. He explained that he fulfilled all the requirements to practice radiology and earned a certificate of added qualification in pediatric radiology. In the context of treating patients, Dr. Rampton described his job as reviewing an imaging "study" to determine if the results are abnormal and, if so, why.

¶19 Dr. Rampton reviewed the results of R.O.'s exams and noted the presence of subdural hemorrhages. Dr. Rampton also reported that the exams showed "areas of restricted diffusion, which suggests cytotoxic edema and brain injury[.]" Dr. Rampton clarified that cytotoxic edema are "areas of brain that . . ., in the context of skull fractures

8

and the subdural collections, are likely related to a traumatic brain injury." However, he indicated that both a blunt trauma as well as a contusion of the brain could produce cytotoxic edema. For example, Dr. Rampton shared that "sometimes . . . prolonged seizure activity will result in cytotoxic edema if the child was seizing."

¶20 Dr. Rampton additionally identified torn blood vessels, several skull fractures, and signs of blunt trauma to the back of the skull based on his review of R.O.'s exams. He pointed out that the signs of blunt trauma were "directly underneath those multiple skull fractures." The overlap of signs of trauma and fractures led Dr. Rampton to conclude that "it's most likely that these are posttraumatic manifestations of brain injury[.]" He ruled out the pattern detected in R.O.'s results as indicative of a "child who . . . went into cardiopulmonary arrest for several minutes[.]"

¶21 Dr. Dries was deposed by the State in Salt Lake City on September 22, 2017, and Ashley virtually attended and participated in the deposition. Dr. Dries conducted a complete ocular evaluation of R.O. The results of the retinal exam showed R.O. had "intraretinal hemorrhages centered mostly in the posterior pole with scant intraretinal hemorrhages in the peripheral retina in both eyes." Dr. Dries noted that this pattern "points towards abusive head trauma[.]" Ashley asked if that pattern ruled out any other causes of hemorrhages. Dr. Dries responded that "[o]ther evaluations need[ed] to be done in order to rule out" causes other than abusive head trauma. He explained that he did not investigate other causes because other members of R.O.'s care team had that responsibility. Similarly, Dr. Dries remarked that his examination was just one piece of a jigsaw puzzle—though he

9

noted that the puzzle presented by the evidence in R.O.'s case revealed abusive head trauma as the most likely diagnosis.

¶22 Dr. Hansen testified in person at trial. At the time of treating R.O., she was a child abuse pediatrician and a member of the Safe and Healthy Families Child Protection Team at Primary Children's in Salt Lake City. She earned a lifetime certificate for general pediatrics and a certificate in child abuse pediatrics. Dr. Hansen testified that her credentials and experience allow her to perform differential diagnosis—thinking of other causes for injuries, and incorporating patient history, exams, and tests—when evaluating if child abuse occurred. She defined abusive head trauma as "the umbrella term for any non-accidental—in other words[,] abusive—injury to the head." Dr. Hansen agreed that non-accidental trauma is, impliedly, an intentionally inflicted injury. Dr. Hansen then provided an overview of when shaken baby syndrome usually occurs—"a caregiver who might not ever otherwise have harmed the child, loses [their composure due to the child's crying], shakes the baby violently, and . . . introduces . . . rotation forces" that can be "very injurious" to the brain. The resulting injuries, according to Dr. Hansen, manifest with "subdural hemorrhage" as well as "retinal hemorrhages" and "neurologic symptoms." She also remarked that skull fractures may occur in instances of abusive head trauma but, due to the difficulty in detecting such fractures, may go undetected by parents as well as medical providers. Dr. Hansen agreed that sometimes radiologists lacking specialized training mistake fractures for sutures.

¶23 When determining the timing of abusive head trauma, Dr. Hansen listed clinical information as the most important piece of information. She stated that radiology can also

assist with narrowing down the time of the trauma, but "clinical information is the most precise." Dr. Hansen explained that a baby will become symptomatic immediately after an abusive head trauma—though some symptoms, such as an epidural hematoma, may be "slow growing." In R.O.'s case, Dr. Hansen declared that there was "nothing on [his] neuroimaging that suggest[ed] anything that would develop over time." In other words, R.O.'s neuroimaging suggested he immediately developed symptoms of abusive head trauma rather than gradually developing those symptoms. Dr. Hansen pinpointed the time of the injury as "after the time when he was last noted to be himself, to be well, to be eating, to be acting his usual self[.]"

¶24 Dr. Hansen confirmed that R.O. became her patient upon his arrival to Primary Children's on June 10, 2016. She first saw him on June 11, 2016. Brittany provided Dr. Hansen with a history of R.O.'s symptoms—including a cold in early June, but nothing akin to seizures at any point prior to June 8, 2016. Dr. Hansen was particularly concerned with Brittany's reports of R.O. being lethargic and limp when Brittany arrived home on June 8, 2016, and over the course of that night. Dr. Hansen's initial impression of R.O. was that he was in "pretty good" condition and "awake and alert," despite him having "had some seizures not long before [she] saw him." Dr. Hansen remarked that the first of these seizures occurred on June 10, 2016, and were likely caused by his injuries. In addition to Dr. Hansen's initial examination of R.O., she reviewed his records from St. Peter's, the lab work that had been performed on R.O., and the skeletal survey, CT scan, and MRI. She also conferred with Dr. Dries about his eye findings. From this information, Dr. Hansen determined that R.O. had been the victim of abusive head trauma.

11

¶25   She supported this diagnosis by citing a "constellation of injuries" including "his five skull fractures; his subdural hemorrhage that's defuse and spread all over his head, which is typical of shaking; his torn . . . bridging vessels . . .; and . . . retinal hemorrhages that weren't diagnostic of shaking, but which fit it perfectly."  Dr. Hansen reasoned that there was no "history of trauma that could explain these things."  She also did not find any other medical causes that could explain R.O.'s condition and, to the extent other medical causes could explain his condition, she ruled those out.  Ultimately, Dr. Hansen concluded that "someone . . . hurt him," but dismissed the possibility of any of R.O.'s siblings (all under the age of seven) causing his injuries.  Dr. Hansen reinforced this conclusion by theorizing that R.O. falling three feet and hitting his head on carpeted floor would not have resulted in enough force to cause the sort of fractures found on his skull.  She stated that R.O. endured a "lot of fractures," indicative of a "major head injury."  Dr. Hansen forecasted that R.O. may experience developmental delays, weakness on one side of his body, learning disabilities, and attention deficit disorder.

¶26   The District Court characterized Dr. Galaznik's report as "commentary" on R.O.'s medical records, rather than as a demonstration of Oliphant's actual innocence.  Because Oliphant's petition failed to demonstrate his innocence—thereby showing a clear miscarriage of justice, the court held that Oliphant fell short of providing an equitable reason to depart from the determination that the PCR petition was time barred.  The court dismissed the argument that Dr. Galaznik's report constituted new evidence—instead concluding that Dr. Galaznik merely offered a new interpretation of evidence that had been introduced.

¶27 Though Oliphant's counsel did not opt to introduce any medical experts, the court reasoned that the jury was "presented with evidence from numerous medical practitioners[.]" Additionally, the court noted that R.O.'s medical records were made available to Oliphant.[3]

¶28 The District Court denied Oliphant's motion for new trial based on its determination that Oliphant did not offer newly discovered evidence that could not have been obtained when the matter went to trial, and that he had not established that he was prejudiced by his attorney's performance to the extent that the outcome would have been different.

## STANDARD OF REVIEW

¶29 This Court reviews a district court's denial of a petition for postconviction relief to determine whether the court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *Jordan v. State*, 2007 MT 165, ¶ 5, 338 Mont. 113, 162 P.3d 863. We review de novo the mixed questions of law and fact presented by claims of ineffective assistance of counsel. *Weaver v. State*, 2005 MT 158, ¶ 13, 327 Mont. 441, 114 P.3d 1039. When scrutinizing whether counsel was deficient, this Court does not analyze the conduct with hindsight; instead, we presume that counsel's conduct falls within a range of acceptable professional assistance, and a defendant must overcome that presumption. *State v. Schowengerdt,* 2018 MT 7, ¶ 31, 390 Mont. 123, 490 P.3d 38.

---

[3] The petition does not raise a *Brady* issue or contend that all medical records in the possession of the prosecution were not delivered to the defense.

## DISCUSSION

¶30 *Issue One: Did the District Court correctly deny Oliphant's petition for postconviction relief based on an absence of newly discovered evidence as required by § 46-21-102(2), MCA?*

¶31 As a general rule, petitions for postconviction relief must be filed within a year of a final judgment. Section 46-21-102(1), MCA. However, § 46-21-102(2), MCA, also allows a petitioner to present a claim that:

> alleges the existence of newly discovered evidence that, if proved and viewed in light of the evidence as a whole would establish that the petitioner did not engage in the criminal conduct for which the petitioner was convicted, within 1 year of . . . the date on which petitioner discovers, or reasonably should have discovered, the existence of the evidence, whichever is later.

Oliphant argues that "[a]s soon as [he] had the expert opinion necessary to demonstrate the prejudice suffered as a result of Ashley's ineffectiveness for failure to call an expert, he filed his [PCR] petition," thereby rendering it timely under § 46-21-102(2), MCA. Oliphant contends that he should be granted an exception to the one-year limitation because of the newly-discovered evidence proffered by Dr. Galaznik and because this Court has previously refrained from imposing a time bar where "the failure to toll on equitable grounds would work a clear miscarriage of justice[.]" *Davis v. State*, 2008 MT 226, ¶ 25, 344 Mont. 300, 187 P.3d 654.

¶32 The District Court concluded that Oliphant's PCR petition did not allege the existence of any newly-discovered evidence. We agree.

¶33 Not all information obtained after trial qualifies as "new" evidence. We have rejected a petitioner's assertion that expert analysis solicited after trial constituted newly discovered evidence. While one qualifying factor is that the evidence must have been

14

discovered since the defendant's trial, *State v. Clark,* 2005 MT 330, ¶ 34, 330 Mont. 8, 125 P.3d 1099, "additional analysis of the same evidence used at trial" is not newly discovered evidence. *Kenfield v. State*, 2016 MT 197, ¶ 15, 384 Mont. 322, 377 P.3d 1207 (concluding that an expert report obtained by the defendant after trial regarding bullet trajectory analysis was not newly discovered evidence). Regarding such analysis as newly discovered evidence would undermine the finality of convictions by awarding petitioners' new trials for simply finding a second opinion of the same evidence disclosed at trial. *Garding v. State,* 2020 MT 163, ¶ 42, 400 Mont. 296, 466 P.3d 501.

¶34 The District Court did not abuse its discretion by concluding that Dr. Galaznik's report constituted "commentary upon medical records" rather than newly discovered evidence that demonstrated Oliphant's actual innocence. The court thoroughly analyzed the record, and determined that the "interpretation" of Dr. Galaznik did not demonstrate Oliphant's innocence in light of the entirety of the testimony provided by medical experts at trial. Further, the evidence Dr. Galaznik relied on in his report was made available to Oliphant prior to or at trial.[4] As the court pointed out, "[t]he evidence used to convict Oliphant was known to him before the trial."

---

[4] The Dissent alleges that we mischaracterize what evidence Oliphant received prior to and at trial based on the documents in Ashley's file. The Dissent fails to confront the possibility and likelihood that the omitted documents merely summarized or repeated evidence available in other documents and provided by witness testimony. For instance, Dr. Hansen testified to the details of her care on June 11, 2016. There is no indication that the "progress note" allegedly missing from Ashley's file contained any different information. In other words, the absence of a document from Ashley's file is not the same as the absence of that information from the record. Four of the allegedly missing documents are such "progress notes." Another four of the allegedly missing documents are referred to as "Safe and Healthy Families" documents with the following number of pages: one, one, two, and six. Dr. Hansen was a member of the Safe and Health Families team and testified at length to the care provided by her and her team. Another four are labeled "Social

15

¶35     Oliphant argues that the District Court should have exercised its wide discretion with respect to granting discovery by allowing Oliphant to seek out expert testimony and medical records to support his ineffective assistance claim. Allowing Dr. Galaznik access to other potential medical records would not render his opinions admissible. The Dissent fails to show how additional discovery would augment the nature of the commentary already offered by Dr. Galaznik or transform his opinions into newly discovered evidence.

¶36     *Issue Two: Did the District Court correctly deny Oliphant's petition for a new trial based upon the alleged ineffective assistance of his trial counsel?*

¶37     Oliphant argues that the District Court failed to apply the "miscarriage of justice" exception to the time bar of his PCR petition based on the ineffective assistance of counsel he received. However, the petition fails to establish that Ashley provided Oliphant with ineffective assistance. In assessing ineffective assistance of counsel claims, Montana courts apply the United States Supreme Court's two-prong test as articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *See State v. Colburn*, 2018 MT 141, ¶ 21, 391 Mont. 449, 419 P.3d 1196. Under the first prong of the *Strickland* test, the defendant must show "counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Golie v. State*, 2017 MT 191, ¶ 7, 388 Mont. 252, 399 P.3d 892 (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064). Under the second prong of *Strickland*, the defendant must show that counsel's

---

Work Note" and have the following number of pages: one, one, one, and two. It is unclear whether such Social Work notes would have any bearing on Dr. Galaznik's medical interpretation and whether such information was presented in a different format at trial. There is a difference between Oliphant not having access to all the evidence and Ashley's file not containing every document restating that evidence.

16

performance prejudiced the defense. *Whitlow v. State,* 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861. Because a defendant must prove both prongs, an insufficient showing under one prong eliminates the need to address the other. *Whitlow*, ¶ 11.

¶38 This Court presumes effective assistance of counsel. *State v. Daniels*, 2003 MT 247, ¶ 21, 317 Mont. 331, 77 P.3d 224. A petitioner for postconviction relief must prove by a preponderance of the evidence that they are entitled to relief. *Rogers v. State*, 2011 MT 105, ¶ 15, 360 Mont. 334, 253 P.3d 889. A petitioner seeking to overturn a district court's denial of postconviction relief based on an ineffective assistance of counsel claim bears a heavy burden. *Whitlow*, ¶ 21.

¶39 In *Whitlow*, a petitioner for postconviction relief alleged that their trial attorney's performance during voir dire amounted to ineffective assistance of counsel. *Whitlow,* ¶ 3. Counsel stated in an affidavit several years after the trial that they no longer believed that a juror they permitted to serve was unbiased. *Whitlow,* ¶ 3. This Court upheld the District Court's conclusion that the petitioner failed to establish that their counsel fell below the performance standard required by *Strickland*. *Whitlow,* ¶¶ 31-32. Applying a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, we held that counsel's attentiveness to the relevant proceedings, maintenance of notes, and review of pertinent information documented adequate performance—despite counsel later second guessing their determination that, at the time of voir dire, the potential juror was not biased. *Whitlow*, ¶¶ 31-33.

¶40 Here, Oliphant points to behaviors and decisions by Ashley that do not necessarily demonstrate "errors so serious" that Ashley fell below the constitutional standard of

17

assistance identified by the first prong of *Strickland*. Oliphant testified at trial and denied causing R.O.'s injuries. Ashley weighed several different strategies, questioned experts during depositions, and raised the possibility of Brittany and others inflicting these injuries on R.O. Though the Dissent concludes that Ashley provided ineffective assistance of counsel, such a conclusion requires considerable speculation on our part.

¶41 For a petitioner to succeed on a claim of ineffective assistance of counsel based on their counsel's failure to present expert testimony, they must do more than merely speculate that such an expert exists or that the expert would testify persuasively to an alternate diagnosis. *See Elliott v. State,* 2005 MT 10, 325 Mont. 345, 106 P.3d 517; *Wilkes v. State*, 2015 MT 243, ¶ 26, 380 Mont. 388, 355 P.3d 755. The petitioner in *Wilkes* went beyond mere speculation by identifying multiple experts their counsel could have called at trial. *Wilkes*, ¶ 27. Comparatively, Oliphant has not offered sufficient information as to whether expert testimony was available, what that testimony would contain, or what impact such testimony would have. Ashley considered offering expert testimony but ultimately decided against it. Johnson notes there was a "a clipping with an advertisement for a medical expert . . . in cases involving shaken baby syndrome and abusive head trauma." She indicates he discussed hiring a medical expert and an investigator and that he inquired into the availability of funds. Absent more information, this Court cannot conclude that Ashley's conduct fell outside the wide range of reasonable professional assistance. His decision could be explained by manifold, acceptable rationales such as the nonexistence of an expert who could persuasively counter the overwhelming testimony provided by the five State experts.

18

¶42 Oliphant also takes issues with Ashley not making a single objection during trial. However, our case law does not support that the number of objections is a determinative factor in our analysis of the first prong of the *Strickland* test. *See, e.g., Riggs v. State,* 2011 MT 239, ¶¶ 53-54, 362 Mont. 140, 264 P.3d 693 ("Counsel's use of objections lies within his or her discretion.")

¶43 These "errors" do not provide this Court with sufficient rationale to reverse the District Court's decision not to grant Oliphant a "miscarriage of justice" exception, especially given a strong presumption that Ashley's conduct fell within the wide range of reasonable professional assistance. *See Whitlow,* ¶ 33. This Court accords great deference to defense counsel's exercise of judgment in determining appropriate defenses and trial strategy. *See State v. Dethman,* 2010 MT 268, ¶ 19, 358 Mont. 384, 245 P.3d 30. Even if Ashley later regretted decisions he made leading up to and during trial, the *Whitlow* Court specified that how counsel performed at the time of the alleged shortcoming is the relevant period of analysis. *Whitlow,* ¶¶ 31-33. Petitioners have not demonstrated that Ashley's performance leading up to and during trial indicated noncompliance with an objective standard of reasonableness. Johnson's affidavit indicates that Ashley did not neglect to investigate different trial strategies but rather reasonably considered defenses and made a strategic decision to proceed in a specific fashion. *See State v. Hendricks*, 2003 MT 223, ¶ 7, 317 Mont. 177, 75 P.3d 1268.

¶44 In any event, Oliphant fails to satisfy the second prong of *Strickland*, which requires the defendant show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Dawson v. State,* 2000 MT 219,

¶ 147, 301 Mont. 135, 10 P.3d 49. As summarized by the District Court, five medical experts "testified the victim suffered non-accidental abusive head trauma while in Oliphant's care." Oliphant has not shown a reasonable probability that absent Ashley's errors the outcome would have been different given the substantial evidence indicating Oliphant's guilt. It follows that the District Court did not abuse its discretion by declining to apply an exception to the time bar rule with respect to Oliphant's untimely PCR petition.

¶45   This Court grants exceptions for miscarriages of justice when it is "obvious that the judgment rendered is a complete nullity." *See State v. Pope*, 2003 MT 330, ¶ 69, 318 Mont. 383, 80 P.3d 1232 (internal citation omitted). In *Pope*, we granted such an exception as a result of a "glaring error" by the district court as well as the presentation of new evidence by the petitioner. *Pope*, ¶ 69. Here, the District Court conducted a thorough review of the record and did not identify any such error or new evidence.

## CONCLUSION

¶46   Oliphant filed an untimely PCR petition. The District Court did not abuse its discretion by thoroughly reviewing the record and determining that Oliphant failed to present any newly discovered evidence that would justify an exception to the time bar. The court also did not abuse its discretion in deciding not to grant Oliphant an exemption pursuant to a miscarriage of justice arising from the alleged, but not established, claims of ineffective assistance of counsel.

¶47   The order to deny the motion for a new trial is affirmed.

/S/ MIKE McGRATH

20

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

Justice Ingrid Gustafson, dissenting.

¶48 The Opinion provides a lengthy detail of the State's substantial evidence at trial and, in essence, concludes that since five medical experts testified R.O. suffered a nonaccidental abusive head trauma, Oliphant was not prejudiced by any potential ineffective assistance of counsel (IAC). This completely misses the point of Oliphant's appeal here. Oliphant appeals the denial of his petition for postconviction relief and the District Court's failure to rule on his post-sentencing motion for discovery. Oliphant's petition for postconviction relief did not ask the District Court to immediately overturn his conviction, but only to allow discovery and stay the petition until discovery could be completed and, if appropriate then, permit him to file an amended petition. In response to his petition for postconviction relief, the State asserted Oliphant's petition was untimely and Dr. Galaznik's opinion did not constitute new evidence, but rather was based on records that were in Ashley's possession. In reply, Oliphant corrected the State's inaccurate assertion that Dr. Galaznik's opinion was based on records in Ashley's case file, specifically detailing the *medical records* his current counsel had *obtained* that were *not in his trial counsel's file and not presented at trial, but which were relied on, in part, by Dr. Galaznik* in his preliminary report. Oliphant further delineated how the untimeliness of his petition was due to IAC—

21

producing a letter from Ashley advising him there were no appealable issues in his case and that his only avenue for relief was sentence review—which resulted in Oliphant not understanding he could pursue appeal and/or postconviction relief or the time requirements of such. In its order denying Oliphant's petition as untimely, the District Court did not address the apparent impact of Ashley's letter advising Oliphant there were no appealable issues in his case and that his only avenue for relief was sentence review. The District Court also ignored the fact that Dr. Galaznik's opinion relied on a number of records that *were not* in Ashley's file *and not presented at trial*—thus not available to Oliphant at trial—and never specifically ruled on Oliphant's motion for discovery.

¶49 The situation with trial counsel in this case is unique and tragic. Unbeknownst to Oliphant, Ashley suffered from esophageal cancer and was undergoing treatment during the time period he was representing Oliphant. By the time of trial, he was having difficulty speaking, hearing, and eating and had significantly decreased energy. His legal secretary, Ms. Johnson, averred that "his health had declined to a point that he was unable to effectively represent Mr. Oliphant." Ms. Johnson also averred that Ashley had advised he intended to hire both a private investigator to interview witnesses and a medical expert and that there were funds available to do so. Ashley failed to do either. At trial, his performance was minimal at best—filing no pretrial motions; giving only a brief opening; failing to cross-examine two of the State's medical witnesses; in contradiction to his brief opening statement and his cross-examination strategy of challenging whether any assault had even occurred, conceding on closing that R.O. was assaulted; failing to make even one objection; and failing to submit any jury instructions or object to the State's proposed

22

instructions.[1]  His representation at sentencing was similarly deficient—assuring Oliphant he would have a favorable outcome, failing to assure a continuance so witnesses could be called, having no witnesses available to testify, and not presenting testimony or a statement from Oliphant.  Things did not improve post-sentencing when Oliphant advised Ashley he desired to appeal.  In response, instead of advising how to proceed with an appeal, Ashley sent a letter advising there were no appealable issues and the only available avenue for relief was sentence review—and further advising that he had consulted with other attorneys about potentially appealable issues and they had likewise agreed there were no appealable issues.  Ashley did not advise Oliphant about his appeal rights, the appeal process, or the availability of postconviction relief and the timeframe in which a petition must be filed. Ashley died March 29, 2018, just two days before Oliphant's conviction became final—at which time, based on the advice of his counsel, Oliphant believed his only means of seeking relief was through sentence review.

¶50    Upon the Montana Innocence Project (MTIP) becoming involved with Oliphant, it was discovered medical records existed which Ashley did not possess and, as such, were not available to him prior to or at the time of trial.  MTIP then attempted to obtain the medical records that existed but were not in Ashley's case file directly from providers. MTIP was successful in obtaining some of those records and secured a preliminary expert, Dr. Galaznik, pursuant to the mandates of *Elliot v. State*, 2005 MT 10, 325 Mont. 345, 106

---

[1] While I agree that failure to make an objection, in itself, does not necessarily establish IAC, when combined with Ashley's numerous other failings, it lends further credibility to Oliphant's claim of IAC.

P.3d 517, who prepared a preliminary report with his opinions based in large part on those newly secured records.[2] Dr Galaznik's preliminary opinions were contrary to the medical evidence of injury and the timing of injury presented by the State at trial. Dr. Galaznik reserved the right to amend his report upon review of the additional medical records not presented at trial and missing from Ashley's file. Rather than assist MTIP in obtaining the records or even just allowing the records request process to continue, the State actively interfered, thwarting Oliphant's efforts to obtain these records—including directing providers not to disclose the records and advising MTIP the records would not be helpful to Oliphant. This resulted in even further delay with Oliphant filing a Motion to Order State's Disclosure of Discovery contemporaneously to his petition for postconviction relief seeking stay of the petition pending full discovery, and, if appropriate then, the ability to file an amended petition for postconviction relief.

¶51    The Opinion asserts that Oliphant has not offered information as to what expert testimony would contain or the impact of such testimony and concludes Dr. Galaznik's report was merely a different interpretation of the evidence made available to Oliphant prior to trial. Again, this misses the mark. Oliphant is asserting that his trial counsel failed to obtain all of the relevant medical records which existed and failed to consult with or obtain a medical expert to then review all of the existing records. This failure, in turn,

---

[2] Oliphant has provided a table in his Reply brief identifying exactly which medical records were not presented at trial and were not in Ashley's file—thus constituting newly discovered evidence—which Dr. Galaznik relied upon in forming his opinion contained in his preliminary report. The Opinion acknowledges that it is unclear whether these documents would have any bearing on Dr. Galaznik's medical opinion—which is exactly the point of Oliphant's discovery request.

resulted in Oliphant not being able to rebut the State's evidentiary presentation at trial and now not being able to offer information as to what Dr. Galaznik's medical opinion would contain and the effect it would have. This is akin to playing a football game but never permitting your defense to take the field—not surprisingly, under such a circumstance, the other team's offense would be victorious with an overwhelming win. When Oliphant was able to obtain some of the records which were not in Ashley's case file and not presented at trial, they led his expert to advance a preliminary opinion regarding the timing of R.O.'s injury which was contrary to the opinions of the State's medical experts and contrary to a conclusion that Oliphant caused R.O.'s injury.[3] As such, it was the ineffectiveness of counsel in preparing for trial that precluded Oliphant from presenting a full defense and leaving the trial record to contain only substantial evidence of Oliphant's guilt. The District Court, the State, and this Court all ignore the circularity problems with this case. Oliphant needs discovery to obtain the medical expert reports to prove the second *Strickland* prong—but for counsel's deficient acts, the outcome would have been different—but cannot get that discovery because his claim is untimely. His claim is untimely, though, because of the bad advice of his trial counsel, and the deficiency of his trial counsel cannot be addressed because the claim is untimely. The same circuitous problems exist relating to discovery—Oliphant cannot meet the exception to the time bar without discovery, but cannot get discovery because he cannot meet the exception to the time bar.

---

[3] Thus, even if five medical experts testified the injury was non-accidental, Dr. Galaznik's report challenges the time of the injury.

¶52 In reviewing trial counsel's representation in its entirety, I would conclude it was deficient, clearly satisfying the first prong of the *Strickland* test. The State could not prove its case without medical expert testimony. At a minimum, defense of the case would involve challenging the medical evidence presented by the State. There is no justifiable or plausible reason for Ashley to have not consulted with and/or obtained medical experts to challenge the State's evidence—and the only indicated reason for not doing so was that he was not diligently attending to his representation of Oliphant while he was suffering with and dying from cancer.

¶53 As to the second *Strickland* prong, without permitting Oliphant additional discovery, it cannot be concluded that but for Ashley's failure to secure all existing medical records and consult with and/or obtain medical experts, the results of the proceedings would not have been different. Accordingly, I would reverse the District Court's order denying Oliphant's petition for postconviction relief and remand the matter to the District Court to stay postconviction relief proceedings to allow Oliphant opportunity for discovery and to amend his petition for postconviction relief should the discovery warrant such.

/S/ INGRID GUSTAFSON

Justice James Jeremiah Shea joins in the dissenting Opinion of Justice Gustafson.

/S/ JAMES JEREMIAH SHEA