DA 22-0722

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 200

FILED

09/09/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0722

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

BRYAN NEIL ARVIDSON,

      Defendant and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC-2021-475
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

        Tammy A. Hinderman, Appellate Defender Division Administrator,
Haley Connell Jackson, Assistant Appellate Defender, Helena, Montana

      For Appellee:

        Austin Knudsen, Montana Attorney General, Mardell Ployhar, Assistant
Attorney General, Helena, Montana

        Kevin Downs, Lewis and Clark County Attorney, Helena, Montana

Submitted on Briefs:  August 27, 2025

Decided:  September 9, 2025

Filed:

_____
                Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Bryan Neil Arvidson (Arvidson) appeals from the October 25, 2022 Amended Judgment and Commitment entered by the First Judicial District Court, Lewis and Clark County, following his conviction of attempted deliberate homicide, criminal endangerment, obstructing a peace officer, and tampering with or fabricating physical evidence. We address the following issues on appeal:

1. *Whether trial counsel rendered ineffective assistance of counsel by not pursuing a defense of justifiable use of force, or attempted mitigated deliberate homicide as a lesser included offense, or objecting to the State's characterization of the requisite mental state in its closing, and whether these claims can be addressed on direct appeal.*

2. *Whether the District Court erred by issuing a written judgment that increased Arvidson's sentence beyond the sentence orally pronounced.*

On Issue 1, we affirm the mental state ineffective assistance of counsel (IAC) claim, and affirm the remaining claims without prejudice to Arvidson pursuing them in post-conviction relief. On Issue 2, we reverse and remand for entry of an amended judgment, which the State concedes.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 The State charged Arvidson with attempted deliberate homicide, criminal endangerment, tampering with evidence, assault on a peace officer, and obstructing a police officer, stemming from a shooting incident involving law enforcement at Arvidson's home. The facts presented at trial are summarized below.

¶3 On the evening of October 1, 2021, Arvidson began target shooting at his home outside of Helena. He called law enforcement prior to shooting to alert them of his plans.

2

Two of his nearby neighbors separately called the police to report the gunshots, with one neighbor stating that the shots were "whizzing" overhead and had hit a hard object near his home. Two officers promptly responded to the call, and upon their arrival, Arvidson told them his neighbors had plotted to kill him and his family, and he had received death threats. Arvidson further stated he had guns to protect his family. The officers discussed the complaint with Arvidson, concluded that he was not acting illegally by shooting on his property, and left.

¶4 After the officers left, the shooting continued, and neighbors again called dispatch complaining of the direction and increased number of the shots. Arvidson also called, asking for the supervising officer and aggressively asking why the officers had earlier been dispatched to his house. Arvidson's tone shifted dramatically, and his language grew combative. The dispatch operator asked Arvidson to stop cursing, but he continued cursing, increased his volume, and called the dispatcher derogatory names, leading the dispatch operator to terminate the call. A deputy called Arvidson back and was met with a similar tone. Arvidson appeared to be increasingly agitated, stating that he was being racially profiled and had been harassed by the police for years.[1] He referenced having mental health issues. Thereafter, Arvidson continued to discharge his firearm on his property. Based upon the information the deputy had received from the neighbors, and from his own observations, the deputy determined to cite Arvidson with criminal endangerment.

---

[1] Arvidson's briefing indicates that he is a black man.

¶5     About 11:45 p.m. that night, a SWAT team arrived outside Arvidson's home with an armored vehicle referred to as the "BEAR."  When they arrived, Arvidson was on his porch, wearing a holster with a pistol.  Officers told Arvidson he was under arrest and directed him to walk backwards towards the BEAR.  Arvidson responded to the officer's statement that he was under arrest by asking, "what for," and began mocking the officers, flipping them off, and performing other lewd gestures.  He then claimed he could not hear the officers' directions over the BEAR's diesel engine, which the responding officers did not believe to be true given the back-and-forth conversation up to that point.

¶6     The SWAT team was armed with "less lethal" foam bullets and attempted to end the conflict by firing twice at Arvidson.  The first shot missed, but the second foam bullet hit Arvidson on his hip.  Arvidson was stunned but ran inside his house.  Positioned at his front window, Arvidson fired 7 rounds toward the BEAR and the officers.  At least 2 rounds hit the BEAR.  One officer later testified: "[I]t was obvious he was trying to shoot at us. . . .  I felt he was trying to kill us."  Arvidson then called dispatch, stating:

> Fires were shot.  They shot at us.  At us.  I had to return fire.  I wasn't sure they were trying to kill me or what.  I've been fighting with this law enforcement for 30 years.  I don't know.  I don't know what to do. . . . They're trying to kill me and my family.  I've got my gun. . . . I don't know what the fuck is going on.

Arvidson could then be heard yelling for his family to get down.  The dispatch operator transferred the call to an officer at the scene.  The officer asked Arvidson to walk outside and assured him they wanted to resolve the situation peacefully.  Arvidson responded disagreeably.  The officer explained that law enforcement was using nonlethal foam

4

bullets, to which Arvidson responded, "I, I don't know, at this time with the death threat and the murder . . . that's going on with the neighbors, I don't know what the fuck you guys are doing out there man. Are you fucking kidding me?" Through the night, a law enforcement crisis negotiation team sought to speak with Arvidson, but communication was difficult, with Arvidson speaking in an aggressive, agitated state, and hanging up repeatedly. At one point, Arvidson said, "Come see me and see what's up," in a threatening tone.

¶7 About 6:00 a.m., Arvidson's family left the home. Nearly an hour later, Arvidson surrendered and was taken into custody. Upon analysis of the house and surrounding area, officers found bullet marks on the BEAR, a wooden play set, and markers facing South, in the direction the neighbors were located who had called dispatch at the beginning of the incident.

¶8 On October 27, 2021, the District Court conducted Arvidson's arraignment and scheduled a jury trial for April 4, 2022. On November 3, 2021, the Office of State Public Defender (OPD) filed a Notice of Substitution of Counsel designating Kathleen Jensen (Jensen) as Arvidson's attorney. Three months later, upon Jensen's departure from OPD, OPD reassigned the case to Steven Scott (Scott). The final pre-trial conference was held March 10, 2022. Although Scott had earlier advised Arvidson in a letter that he did not know if he would be ready for trial, Scott assured the District Court at the final pre-trial conference that he was prepared for trial as scheduled.

5

¶9 Scott conveyed during his opening statement that, upon the arrival of the BEAR outside of his home, "[Arvidson] didn't know that it was law enforcement," and instead he "believe[d] that there were neighbors that wanted to kill him," and thus "believed that these neighbors had driven up and that's who was in his yard." Scott explained that, after being hit by the nonlethal shot, Arvidson "gets into his house, closes the door, and he shoots but he doesn't believe that he's shooting at law enforcement."

¶10 Following the presentation of evidence, Scott altered his emphasis during closing argument. Scott continued to maintain that Arvidson lacked knowledge that the vehicle belonged to law enforcement, but focused on the lack of an inspection report confirming there was no bullet damage to the BEAR prior to the incident, and thus argued that there was "no attempted murder . . . because the State can't prove that [Arvidson] ever shot at the BEAR." Scott criticized the investigative process, highlighting law enforcement's failure to conduct a "trajectory rod" analysis to determine bullet paths, and the absence of bullet fragments found in any of the neighbors' yards. Scott did not offer a justifiable use of force (JUOF) defense or request instructions for consideration of attempted mitigated deliberate homicide as a lesser included offense.

¶11 In its closing, the State's argument regarding the attempted deliberate homicide charge included the following comments about the "knowingly" mental state element, in which the prosecutor utilized the term "substantial risk that the result would occur," instead of "high probability that the person's conduct will cause a specific result":

> So deliberate homicide, he purposely or knowingly—which you're going back to mental state. Was it his purpose to cause the death of another human

6

being or did he knowingly engage in conduct that he realized created a substantial risk that the result would occur?

No objection was made. The jury was correctly instructed on the elements of attempted deliberate homicide, both as given orally and in the written instructions, and the instructions themselves are not challenged on appeal.

¶12 Arvidson was convicted of all charges. Prior to sentencing, Arvidson filed several motions taking issue with Scott's representation, contending that Scott failed to adequately address his mental health during the proceedings, including not arranging for a mental health evaluation prior to trial, failed to present evidence of extreme mental distress at the time of the incident, and failed to present the JUOF defense. Arvidson requested appointment of new counsel. The District Court held a hearing on Arvidson's motion and appointed new counsel prior to sentencing.

¶13 The District Court orally pronounced sentence for the four charges of which Arvidson was convicted, as follows:

> Considering all of those things, and I want it noted very clearly in this judgment that it is my intention that Mr. Arvidson never own or possess a firearm for the rest of his life. I am going to sentence him to 40 years in prison for Count 1, attempted deliberate homicide. For Count 3, obstructing a peace officer, I'm sentencing him to six months in jail. Those sentences will run concurrent with each other. For Count 2, criminal endangerment, I'm sentencing him to 6 years in prison with 5 years suspended. That will run consecutive to Counts 1 and 3. For Count 4, tampering with evidence, I am sentencing him to 6 years in prison with 5 years suspended. That will run consecutive to Count 3.

Taken as a whole, the orally pronounced sentence is calculated to require 46 years of incarceration time, with 5 years suspended, including 40 years (Count 1) plus 6 years,

5 years suspended (Count 2, consecutive).  The sentence for Count 3 (6 months) was run concurrently with Count 1, and the sentence for Count 4 (6 years, 5 years suspended) was to run consecutively to only Count 3.  However, the written judgment stated the sentence as follows:

> COUNT I: ATTEMPT (Deliberate Homicide), a felony, in violation of Sections 45-4-103 and 45-5-102(1)(a), MCA, the Defendant is sentenced to the Montana State Prison for a period of 40 years.
>
> COUNT II: CRIMINAL ENDANGERMENT, a felony, in violation of Section 45-5-207, MCA the Defendant is sentenced to the Montana State Prison for a period of 6 years, with 5 years suspended.
>
> COUNT III: OBSTRUCTING A PEACE OFFICER OR OTHER PUBLIC SERVANT, a misdemeanor, in violation of Section 45-7-302, MCA, the Defendant is sentenced to the Lewis and Clark County Jail for a period of 180 days.
>
> COUNT IV: TAMPERING WITH OR FABRICATING PHYSICAL EVIDENCE, a felony, in violation of Section 45-7-207, MCA. the Defendant is sentenced to the Montana State Prison for a period of 6 years, with 5 years suspended.  Credit for time served: Defendant is given credit for the following date range: October 2, 2021 — September 19, 2022
>
> Concurrent/Consecutive provisions:
> The Sentences for Counts I and III shall run CONCURRENTLY.  The Sentence for Count II shall run CONSECUTIVELY to the sentence imposed for Counts I and III.  The Sentence for Count IV shall run CONSECUTIVELY to the sentence imposed for *Count II*.

(Emphasis added.)  Consequently, the written judgment would require 52 years of incarceration time, with 10 years suspended, owing to it running the sentence for Count IV consecutively to Count II, instead of to Count III, as was stated orally.  Additionally, the written judgment included two additional conditions not orally pronounced: (1) prohibiting

Arvidson from possessing or using an electronic device or scanner; and (2) requiring that Arvidson abide by a curfew.

¶14    Arvidson appeals his conviction for attempted deliberate homicide, seeking a new trial. Alternatively, he requests his sentence be conformed to the oral pronouncement, to which the State concedes.

## STANDARDS OF REVIEW

¶15    An IAC claim is a mixed question of law and fact that is reviewed de novo. *State v. Ward*, 2020 MT 36, ¶ 15, 399 Mont. 16, 457 P.3d 955 (citations omitted). This Court reviews for legality a sentence involving incarceration of one year or more. *State v. Champagne*, 2013 MT 190, ¶ 17, 371 Mont. 35, 305 P.3d 61 (citing *State v. Heafner*, 2010 MT 87, ¶ 1, 356 Mont. 128, 231 P.3d 1087).

## DISCUSSION

¶16    *1. Whether trial counsel rendered ineffective assistance of counsel by not pursuing a defense of justifiable use of force, or attempted mitigated deliberate homicide as a lesser included offense, or objecting to the State's characterization of the requisite mental state in its closing, and whether these claims can be addressed on direct appeal.*

¶17    Arvidson argues that Scott provided ineffective assistance of counsel at trial by failing to provide a "viable legal defense" to the charges, including JUOF and/or attempted mitigated deliberate homicide as a lesser included offense, or to object to the incorrect term "substantial risk" used in the State's closing argument regarding the requisite mental state for the attempted deliberate homicide charge. The State answers that Arvidson's ineffective assistance claims should not be reviewed on direct appeal because they are not

9

record-based, and his counsel's actions reflected strategic decisions that cannot be evaluated without knowing the reasons for them. Alternatively, if the Court were to address the claims, the State argues that defense counsel could not have established on this record that Arvidson reasonably believed it was necessary to shoot at officers to prevent imminent death or serious bodily harm, and thus there is no reasonable probability the outcome of the trial would have been different had an alternate defense been presented.

¶18 When considering an IAC claim this Court applies the United States Supreme Court's two-prong test as articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *State v. Bryson*, 2024 MT 315, ¶ 29, 419 Mont. 490, 560 P.3d 1270 (citing *Oliphant v. State*, 2023 MT 43, ¶ 37, 411 Mont. 250, 525 P.3d 1214). The first prong of the *Strickland* test requires the defendant show "counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Oliphant*, ¶ 37 (quoting *Golie v. State*, 2017 MT 191, ¶ 7, 388 Mont. 252, 399 P.3d 892). Under the second prong of the *Strickland* test, the defendant must show that counsel's performance prejudiced the defense. *Oliphant*, ¶ 37 (citing *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861). A defendant must prove both prongs, thus an insufficient showing under one prong eliminates the need to address the other. *Oliphant*, ¶ 37.

¶19 "When a defendant raises ineffective assistance of counsel claims on direct appeal, we must first determine whether the claims are more appropriately addressed in a postconviction relief proceeding." *State v. Secrease*, 2021 MT 212, ¶ 14, 405 Mont. 229,

10

493 P.3d 335 (citing *State v. Rodriguez*, 2021 MT 65, ¶ 31, 403 Mont. 360, 483 P.3d 1080).

"Because our review of ineffective assistance of counsel claims is subject to the 'strong presumption' that counsel's actions are 'within the wide range of reasonable professional assistance,' a record which is silent about the reasons for the attorney's actions or omissions seldom provides sufficient evidence to rebut this presumption." *State v. Sartain*, 2010 MT 213, ¶ 30, 357 Mont. 483, 241 P.3d 1032 (quoting *State v. White*, 2001 MT 149, ¶ 13, 306 Mont. 58, 30 P.3d 340). It follows, that if the record "fails to answer the question 'why' counsel did or did not take the actions" alleged to constitute ineffective assistance, the claim will be "better raised by a petition for post-conviction relief where the record can be more fully developed." *Sartain*, ¶ 30. In "rare instances," we will consider a claim on direct appeal if there is "'no plausible justification' for counsel's conduct." *State v. Fender*, 2007 MT 268, ¶ 10, 339 Mont. 395, 170 P.3d 971 (internal citation omitted).

¶20 Arvidson thus argues there was no plausible justification for his counsel failing to offer the defenses of JUOF or attempted mitigated deliberate homicide, especially in light of Scott's admission in his opening statement that Arvidson, while not knowing it was law enforcement, had fired shots towards the BEAR, which could only be a beneficial tactic when accompanied by a defense that offered an excuse for that conduct, such as justifiable force or mental duress.[2] He argues that, had Scott proffered such a defense, the District Court would have been required to give instructions because there was enough evidence to support them. Because defense counsel provided neither option, the jury was not instructed

---

[2] Arvidson does not claim that Scott rendered IAC by failing to pursue a standalone mental disease or disorder defense. Section 46-14-101, et. seq., MCA.

11

on either defense. Further, Arvidson argues that his trial counsel did not sufficiently develop the alternative theory that he argued in closing argument.

¶21 The State answers that Arvidson is challenging his counsel's strategy, about which the record provides no explanation. The State argues that pursuing a JUOF defense would have required Arvidson, at a minimum, to concede that he acted "purposely and knowingly." *State v. Nick*, 2009 MT 174, ¶ 13, 350 Mont. 533, 208 P.3d 864. While that does not require "an admission that the defendant caused and had the requisite mental state to cause the result, if any, constituting a particular offense," *State v. Dulaney*, 2025 MT 67, ¶ 25, 421 Mont. 251, 566 P.3d 534, it nonetheless carries the risk that "the facts offered in support of a defendant's self-defense theory [will] also support an inference that the defendant's conduct caused the specific criminal result or that he had the requisite mental state to cause that result." *Dulaney*, ¶ 26.

¶22 As the State notes, for strategic reasons Scott may not have wanted to emphasize that Arvidson knowingly fired his gun in a situation involving a group of law enforcement officers. That the use of deadly force against law enforcement was reasonably justified is a challenging defense premise that would not be undertaken lightly. We have previously held that, "[a]bsent evidence of record demonstrating the reasons underlying counsel's actions, we are unable to determine whether the decision not to assert a justifiable use of force defense constituted an unreasonable defense strategy overcoming the presumption that counsel's actions fall within the range of reasonable professional conduct." *State v. Hendricks*, 2003 MT 223, ¶ 9, 317 Mont. 177, 75 P.3d 1268. Similarly, we have noted that

12

"counsel can, for strategic reasons, choose not to offer a lesser included offense instruction." *State v. Parrish*, 2010 MT 212, ¶ 26, 357 Mont. 477, 241 P.3d 1041 (citing *State v. Sheppard*, 253 Mont. 118, 123-124, 832 P.2d 370 (1992)) (defense counsel "may opt to omit a lesser-included offense instruction in order to force the jury to find the defendant guilty of the crime charged or acquit him.") (citation omitted). Scott may have elected to pursue an acquittal of the charge rather than ask the jury to convict Arvidson of a lesser offense, perhaps because Scott had concluded he could not establish a reasonable explanation or excuse for Arvidson's actions upon which the jury would find that he had acted for mitigating reasons. Perhaps the trial evidence was admitted in a manner that influenced Scott to alter his strategy during the course of the trial.

¶23 This is speculative, of course, which underscores that the record does not demonstrate why counsel acted, or that there was no plausible explanation for his actions. Nor does the record reflect the communications between Arvidson and Scott and the decisions they made regarding these issues. "[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. We cannot analyze counsel's representation without a record demonstrating the reasons for his actions under the circumstances of this case, making these IAC claims more appropriate for post-conviction review. *Sartain*, ¶ 30.[3]

_____

[3] The Dissent takes issue with this holding and contends there could be no plausible justification for counsel's actions. The Dissent believes we are "sacrificing judicial economy and efficiency"

¶24 Arvidson briefly references Scott's failure to object to the prosecution's wording describing the mental state requirement for the attempted deliberate homicide charge in closing argument, wherein the prosecutor stated "substantial risk that the result will occur," rather than the language of the jury instruction, "high probability that the person's conduct will cause a specific result." The State answers that the language was incorrect, but that Scott's failure to object did not constitute IAC because the language used was similar to the correct language, was made in passing, the jury was properly instructed in the oral and written instructions, and that, in any event, Arvidson can show no prejudice. We agree that this brief misstatement did not prejudice Arvidson in a manner that undermined the outcome of the trial.

¶25 Lastly, Arvidson requests that, "[t]o the extent this Court disagrees and concludes this claim must be raised in postconviction," the Court order appointment of counsel. With this request, we agree. Section 46-21-201(2), MCA, provides that, "[i]f the death sentence has not been imposed and a hearing is required or if the interests of justice require, the court shall order the office of state public defender, provided for in § 2-15-1029, to assign counsel for a petitioner who qualifies for the assignment of counsel under Title 46, chapter

by "forcing further litigation." Dissent, ¶ 45. However, we believe that, upon this record and in light of our precedent, there could well be a plausible justification for counsel's actions, but that this cannot be determined until there is a record opportunity for counsel to explain his strategy and decisions. That will allow the courts to properly assess the defense's representation under the *Strickland* standards, consistent with our approach in most cases. Only in "rare instances" should this Court conclude that counsel's representation is deficient upon a record that does not explain "why" he took the actions he did. *Fender*, ¶ 10. Indeed, it is the Dissent's position that may force further litigation and sacrifice judicial economy if, after assessment of counsel's actions upon a complete record, the courts would conclude that a new trial—which the Dissent would now order—is unnecessary.

8, part 1, and the Montana Public Defender Act, Title 47, chapter 1." Section 46-21-201(2), MCA. We conclude the interests of justice require appointment of counsel for Arvidson upon his anticipated pursuit of a petition for postconviction relief, assuming Arvidson's qualification for public counsel. *See State v. Johnson*, 2024 MT 152, ¶ 39, 417 Mont. 221, 552 P.3d 683 ("Should Johnson pursue timely postconviction relief, upon appropriate application, the District Court should assign counsel if Johnson otherwise qualifies.").

¶26 *2. Whether the District Court erred by issuing a written judgment that increased Arvidson's sentence beyond the sentence orally pronounced.*

¶27 Arvidson next points to the discrepancy between the orally pronounced sentence given from the bench and the subsequent written judgment, as described above. "[T]he sentence orally pronounced from the bench in the presence of the defendant is the legally effective sentence and valid, final judgment," and therefore "the written judgment and commitment will serve as evidence of the sentence orally pronounced." *State v. Lane*, 1998 MT 76, ¶ 24, 288 Mont. 286, 957 P.2d 9. The State concedes the error here, agreeing with Arvidson that the District Court entered a written judgment that was inconsistent with the orally pronounced sentence. We thus remand to the District Court to enter a second amended judgment which conforms to the oral pronouncement of the sentence.

## CONCLUSION

¶28 Arvidson's IAC claims regarding defense counsel's failure to proffer a JUOF defense, or request a jury instruction for the lesser included offense of attempted mitigated deliberate homicide, are not record-based, and are therefore affirmed without prejudice to pursuing the claims in postconviction proceedings, for which Arvidson should be

15

appointed counsel. Arvidson's IAC claim regarding defense counsel's failure to object to the State's incorrect statements at trial regarding the mental state of deliberate homicide fails to satisfy the *Strickland* test, and is affirmed. Lastly, the written judgment incorrectly reflected the oral pronouncement of sentence and requires entry of a second amended judgment which mirrors the oral pronouncement.

¶29 Affirmed in part, reversed in part, and remanded for entry of an amended judgment.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER

Justice Katherine Bidegaray, concurring and dissenting.

¶30 I respectfully dissent from the Court's conclusion that Arvidson's ineffective assistance of counsel claims regarding justifiable use of force (JUOF), attempted mitigated deliberate homicide (AMDH), and the prosecutor's misstatement of the "knowingly" mental state element cannot be resolved on this record and must await postconviction review. This appeal presents one of the "rare instances" in which the trial transcript itself forecloses any plausible strategic justification for counsel's choices and thus permits direct review under *State v. Fender*, 2007 MT 268, ¶ 10, 339 Mont. 395, 170 P.3d 971 (citing *State v. Jefferson*, 2003 MT 90, ¶ 50, 315 Mont. 146, 69 P.3d 741). Here, defense counsel (1) expressly conceded in opening that Arvidson "shoots"; (2) never noticed or requested

16

instructions on JUOF or AMDH to give that concession lawful effect; and (3) then pivoted at closing to a contradictory no shots "at the BEAR" theory. On this record, there is no plausible justification; we can apply *Strickland* now.

**Direct Appeal Review Is Warranted**

¶31 We have consistently held that we will consider an ineffective assistance claim on direct appeal when the record shows "no plausible justification" for counsel's conduct. *Fender*, ¶ 10. Here, the trial transcript plainly reveals counsel's concession of the conduct element of attempted deliberate homicide in opening statement—telling the jury that Arvidson "shoots but he doesn't believe that he's shooting at law enforcement" as he thought he was firing at neighbors—without coupling that concession with any legal defense theory. Just as no justification could exist in *Jefferson* when counsel admitted his client's guilt on one of the charges during opening and closing arguments, no plausible justification exists here for counsel's conduct Arvidson identifies as being ineffective assistance.

¶32 Arvidson's counsel's opening statement concession was not a fleeting remark. That concession framed this case. Nothing in the trial record—motions, proof, or instructions—supplies a coherent strategy for omitting JUOF or AMDH once counsel chose that framing at the very beginning of the trial. It was counsel's central framing of the case, and it effectively admitted the conduct constituting the charged offense. There is no plausible justification for conceding the conduct element without simultaneously anchoring the admission in a viable legal defense such as JUOF or AMDH. The Majority's deferral to

17

postconviction review ignores that this record alone demonstrates both the concession and the absence of any trial conduct that might explain it.

¶33 The Court's reliance on *State v. Hendricks*, 2013 MT 223, ¶¶ 11-13, 317 Mont. 177, 75 P.3d 1268; and *State v. Sartain*, 2010 MT 213, ¶ 30, 357 Mont. 483, 240 P.3d 60, is misplaced. In *Hendricks*, the record was silent as to why counsel acted, leaving open multiple plausible strategic explanations; the same was true in *Sartain*, where nothing in the trial transcript itself foreclosed reasonable justification. By contrast, the record here does not present a "silent" record—it shows trial conduct that is internally inconsistent and legally incoherent. Counsel's opening statement admitted the shooting, yet no lawful defense theory was presented to fit that admission. The later pivot in closing to denying the act, without having pursued justifiable use of force or attempted mitigated deliberate homicide instructions, compounded the disconnect. This is not a case where the record's silence invites speculation about what might have motivated counsel; the record affirmatively demonstrates the absence of any plausible strategy, placing it within the narrow *"no plausible justification"* exception for direct appellate review.

**No Plausible Justification for Failing to Pursue JUOF**

¶34 The Court cites *State v. Nick*, 2009 MT 174, 350 Mont. 533, 208 P.3d 684, and *State v. Dulaney*, 2025 MT 67, 421 Mont. 251, 566 P.3d 534, for the proposition that justifiable use of force can require conceding the "knowingly" element of deliberate homicide, creating a strategic reason to avoid the defense. That rationale does not fit here. Counsel had already conceded in opening statement that Arvidson "shoots," and nothing in the trial record suggests the defense disputed that the act was knowing in the ordinary sense. Once

18

counsel chose that framing, the legal risk identified in *Nick* and *Dulaney*—that asserting JUOF would be tantamount to admitting knowledge—had already materialized. At that point, pursuing JUOF was the only coherent way to give the jury a lawful framework for acquitting on the basis of Arvidson's belief that his actions were necessary to protect himself and his family. Unlike in *Nick* and *Dulaney*, where the record supported a deliberate strategic choice to preserve a contest over mental state, here the absence of JUOF left the jury with no path to acquittal consistent with the admitted conduct. That omission, in the face of evidence supporting the statutory elements of JUOF under § 45-3-102, MCA, falls squarely within *Fender*'s "no plausible justification" category.

¶35 The evidence supporting a JUOF instruction was compelling and came from both the State's and defense's cases: (1) law enforcement fired two less-lethal rounds at Arvidson, the second striking his hip, without prior warning despite training requiring it when feasible; (2) the rounds were capable of causing serious bodily harm; and (3) Arvidson immediately retreated, fired from inside, and contemporaneously told 911 he feared for his life and the safety of his family.

¶36 Montana law imposes a modest threshold to trigger instructions: "some basis" in the evidence suffices, and once the defendant "has offered evidence of justifiable use of force, the state has the burden of proving beyond a reasonable doubt that the defendant's actions were not justified." Section 46-16-131, MCA; *State v. Marquez*, 2021 MT 263, ¶¶ 17, 21, 406 Mont. 9, 496 P.3d 963. On this trial record—the unannounced less-lethal strike, contemporaneous 911 statements of perceived lethal threat, and officers' acknowledgments—defense counsel's failure to request a JUOF instruction left the jury

19

without the governing law. In these circumstances, a reasonable attorney would request a JUOF instruction. The Majority speculates that counsel might have avoided JUOF to sidestep conceding that Arvidson acted "purposely or knowingly." But Arvidson's counsel had already made that concession in opening statement; JUOF was the lawful theory that could have fit that concession. The "risk" the Majority imagines had already been realized, making the omission of a JUOF instruction indefensible. Hypothetical strategic explanations that are inconsistent with counsel's actual conduct should not shield objectively unreasonable performance from review. On this record, avoiding JUOF cannot be called "plausible strategy."

**No Plausible Justification for Failing to Seek AMDH**

¶37 Similarly, the record presents no plausible strategic reason to forego an AMDH instruction: Arvidson had a documented history of anxiety, depression, agoraphobia, and fear of both his neighbors and police, and he was struck by projectiles in the middle of the night while believing he and his family were under attack. These facts constitute evidence of "extreme mental or emotional stress" sufficient to require an AMDH instruction under § 45-5-103(1), MCA.

¶38 The Majority surmises that counsel may have opted to "force" an acquittal rather than invite conviction on a lesser offense. But that rationale does not fit the trial record. The record does not reflect an all-or-nothing strategy; it reflects an opening in which defense counsel admits the act and a closing argument in which defense counsel denies it, i.e., the opening concedes the shooting and closing argument pivots to an unsupported factual denial that Arvidson shot at the BEAR. This inconsistency betrays an absence of

20

coherent strategy and underscores the unreasonableness of failing to give the jury a middle-ground option. Given Arvidson's contemporaneous fear statements and the circumstances of the nighttime encounter after being struck by a projectile, there was at least some evidence of "extreme mental or emotional stress" to warrant an AMDH instruction under § 45-5-103(1), MCA.

¶39    The State's authorities do not justify the omission. *Leyba* and *Bashor* upheld intentional "all-or-nothing" strategies built around a coherent self-defense theory. *State v. Leyba*, 278 Mont. 45, 49-50, 915 P.2d 794, 796-97 (1996), *overruled in part on other grounds by Whitlow v. State*, 2008 MT 140, ¶ 13 n.2, 343 Mont. 90, 183 P.3d 861; *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).[1] Unlike *Leyba* and *Bashor*, this record does not reflect a deliberate "all-or-nothing" strategy. Here, counsel (1) conceded the act in opening; (2) developed no mitigation theory tied to § 45-5-103(1), MCA; and (3) contradicted his opening at closing. That is not strategy; it is the absence of one. Given "extreme mental or emotional stress" evidence (documented anxiety/depression; night-time strike by projectiles; family sheltering), the jury should have been given an

---

[1] Citing *Leyba* and *Bashor*, the State argues on appeal that: "An attorney may reasonably make a tactical decision to seek an absolute acquittal, rather than requesting an instruction on mitigated deliberate homicide. In *Leyba*, this Court stated that it would 'not . . . second-guess trial tactics and strategy' when Leyba and his attorney had made a tactical decision to seek absolute acquittal on the theory of self-defense, rather than requesting a mitigated deliberate homicide instruction. This Court relied on *Bashor*, in which the Ninth Circuit held that defense counsel's tactical decision to force the jury to choose between finding the defendant guilty of deliberate homicide or acquitting him outright was not ineffective. In both cases, the courts found that counsel was not deficient for failing to request a mitigated deliberate homicide instruction." But these cases are distinguishable.

AMDH instruction. *Accord State v. Craft*, 2023 MT 129, ¶ 12, 413 Mont. 1, 532 P.3d 461; *State v. Freiburg*, 2018 MT 145, ¶ 13, 391 Mont. 502, 419 P.3d 1234.

**Failure to Object to Misstatement of "Knowingly" Element**

¶40     The prosecutor misstated to the jury that "knowingly" meant creating "a substantial risk that the result would occur" rather than a "high probability" that the conduct would cause death; yet defense counsel lodged no objection. Although the jury was correctly instructed, in a case hinging on mental state and bereft of a lawful defense theory, leaving the misstatement uncorrected further diluted the State's burden. This omission, combined with the failures to seek JUOF/AMDH, all of which is evident from the trial record and needs no further factual development, satisfies *Strickland*'s "reasonable probability" standard. While instructions were correct, this was a mental-state-driven case with no lawful defense theory presented. Leaving the prosecutor's "substantial risk" formulation uncorrected, when the statute requires awareness of a high probability that conduct will cause death, § 45-2-101(35), MCA, further diluted the State's burden.

**Majority's Reliance on Hypothetical Strategy**

¶41     The Majority excuses these omissions by imagining plausible strategies: avoiding JUOF to sidestep conceding mental state; declining AMDH to force an all-or-nothing verdict; and reacting to trial evidence by shifting tactics. Yet none of these explanations align with what counsel actually did. Defense counsel conceded knowing use of deadly force in the opening statement, nonetheless did not develop evidence or argument to support either JUOF or AMDH, and gave a closing argument that contradicted his opening statement and the record evidence.

22

¶42     Where the imagined "strategies" are incompatible with the trial record, they are not plausible justifications—they are post hoc rationalizations that our precedent does not require us to accept. *Fender* teaches that, when the record itself shows there is no plausible justification, we may and should decide the claim now.

**Prejudice**

¶43     Had the jury been instructed on JUOF, one juror could have found the shooting justified under the circumstances. Had the jury been instructed on AMDH, it could have convicted on a lesser offense carrying a substantially lesser penalty. Had counsel objected to the misstatement of "knowingly," the jury's evaluation of the State's proof on intent may have been different. These are precisely the "reasonable probabilities" of a different outcome that satisfy *Strickland*.

¶44     Cumulatively, defense counsel's opening concession without a matching lawful theory, the failure to request JUOF or AMDH instructions, and the lack of objection to the State's diluted "knowingly" standard undermined confidence in the verdict. *Strickland* permits assessing prejudice in the aggregate; this record meets that test. Prejudice is satisfied if there is a reasonable probability—enough to undermine confidence—that, but for counsel's errors, at least one juror would have reached a different result. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984). A properly instructed jury could have (1) acquitted on JUOF; (2) convicted of AMDH rather than ADH; or (3) re-evaluated purpose/knowledge under the correct "high probability" standard. Any one of these options would change the outcome on Count I. I would reverse the

Attempted Deliberate Homicide conviction and remand for a new trial limited to that count while joining the sentencing correction.

**Conclusion**

¶45    By postponing resolution to postconviction review, the Majority sacrifices judicial economy and efficiency, forcing further litigation on a record that already demonstrates the absence of plausible justification for counsel's choices.  This case falls squarely within the "rare instances" warranting direct appeal review.  I would hold that counsel's performance was deficient and prejudicial under *Strickland*, reverse the conviction for attempted deliberate homicide, and remand for a new trial on that count.

¶46    I respectfully dissent although I join the Court's sentencing correction.

/S/ KATHERINE M BIDEGARAY

Justices Ingrid Gustafson and Laurie McKinnon join in the concurring and dissenting Opinion of Justice Katherine Bidegaray.

/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON